Chester Lee BOWEN, Appellant,

v.

Fred LOYD, Executor of the Estate of Goldie M. Woodard, Respondent.

No. 30432.

Missouri Court of Appeals, Western District.

Oct. 1, 1979.

Rehearing Denied Oct. 29, 1979.

Lynn M. Ewing, Jr., and Christopher Hoberock, Nevada, for appellant; Ewing, Ewing, Carter, McBeth & Smith, Nevada, of counsel.

Fred M. Teel and Everett E. Teel, Nevada, for respondent; Teel & Teel, Nevada, Eddison.Kaderly, Lamar, of counsel.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

PRITCHARD, Judge.

This is a suit in equity to compel respondent executor to execute a deed to certain real estate in Nevada, Vernon County, Missouri, in accordance with the terms of an alleged oral contract to convey to appellant by testatrix and her husband, who predeceased her. The issue is whether testatrix, owning title with her deceased husband, A. K. Woodard, joined with him in the alleged oral contract to convey so as to be bound thereby.

The facts are these: Prior to 1967, A. K. Woodard operated a carburetor and electric shop in Nevada, Missouri. It was located on real estate owned by him and his wife, Goldie M., as tenants by the entirety. In 1967, because of health conditions, A. K. sold the business to one Wesley Litten who financed his purchase with an S.B.A. loan procured through the Citizens State Bank in Nevada. A. K. told Litten at the time that if he would keep the business in the building and run it and pay him and his wife rent on the building so that they would have an income as long as they lived, Litten could buy their building, "Well, like a dollar to the estate and it would be mine, supposed to of been a contract to that effect, but I never did get it." Goldie had nothing to do with any part of the business that Litten knew about, and did not participate in the negotiations or agreements between him and A. K.

In early 1970, Litten's business closed and he defaulted in the S.B.A. guaranteed note to the Citizens State Bank. Mr. James H. Denman, president of that bank, testified that before the sale to Litten, A. K. came in and talked about selling the business. A. K. told him that he had a good, going business which he wanted to sell to somebody who would continue it and let him work when he wanted to, but on account of his health he was going to have to get out of it. At the time of the conversation, A. K. had Litten in mind and had talked to him about it. A. K. said "that if somebody came into it he was going to make it possible that he would own the whole thing, real

estate and all, when he died. Q. When he and Mrs. Woodard died? [Objection; overruled.] A. He said whichever went first, he didn't know, but he was concerned about his health and he said anybody would be fixed up to where there was no problem." There was a lengthy discussion about the real estate, and Mr. Denman tried to get A. K. to deed it so more could be loaned on the sale, but A. K. said that was not what he was interested in, "he was interested in income. We couldn't touch the real estate the way he did it and I tried to counsel him, I asked him, I said 'well, at least contract to where we could take an assignment' and there was no way you were going to change A. K.'s mind, he had his mind made up how he wanted to do it." After Litten's default, A. K. was quite interested because the bank had all of the equipment and everything tied up with a government insured loan and A. K. had a second (security interest) behind the government. A. K. was trying to get someone to purchase the property because he was still interested as before—income and when he wanted to, a place to work. At one time, perhaps, A. K. brought in appellant with him to the bank, but Mr. Denman had no recollection of Goldie being at the bank during these times.

Appellant's wife, Melba Bowen, who was not a party to the contract and thus was not barred from testifying under the dead man's statute, related these facts: Appellant acquired in early 1970 all of the assets and liabilities of the business from Wesley Litten, and assumed the loan at the Citizens State Bank, which loan was subsequently paid off by appellant. Melba was present in the office portion of the business along with appellant, A. K. and Goldie, when discussions were had as to appellant's taking over of the business from Litten. Melba testified: "Q. If you will limit your answer in describing the agreement, to what you heard in the presence of A. K. Woodard and Goldie Woodard concerning the agreement, I would appreciate it. A. An evening prior to Lee taking over A. K. asked him to come up to the shop after his working hours and look the inventory over and talk over the business and I went down and Mr. and Mrs. Woodard were present. Lee and A. K. looked everthing over and then the four of us set down in the office area and Lee and A. K. discussed how this would be handled and A. K. was wanting Goldie to be protected so he said: 'Lee, if you will pay an amount as rent, $125.00, as long as we both shall live, then the property will be yours.' He said he had offered this to other people, the same deal, because he wanted it to be set up for the lifetime of either of them because he had no relatives and he wanted it to be handled in this manner. Q. Was Mrs. Woodard present? A. She was present. Q. Did she hear the conversation? A. Yes. The four of us were sitting in the office area. Q. Did she make any objection? A. Not at that time that I heard, nothing was said. A. K. and Lee were talking. Q. She did hear it and did understand it? A. Yes." On another occasion at the Citizens State Bank, Goldie was present when the same agreement was discussed. A. K., individually, told Howard Conway that he had given appellant the same deal as he had with Litten—that appellant would pay so much per month for his or her lifetime, then the property would become appellant's. Up to the time of Goldie's death, $10,125.00 was paid by appellant to A. K. and Goldie by monthly checks, $125.00 each, "as rent." After her death, which was apparently in January, 1977, upon the advice of counsel, the $125.00 monthly checks were continued payable to "Woodard Estate" upon Melba's understanding that the payments were to be held in escrow by the Citizens State Bank. Fourteen of these payments were made and endorsed by the bank "credited to the payee thereof." These payments totalled $1,750.00 through April 1, 1978. Appellant made repairs on the building totalling $1,021.87, but did not pay the taxes or insurance on it, because that was the way A. K. wanted it—"for her protection should the building burn or something." On one occasion, the Woodards repaired the roof which was covered by insurance. The property was appraised in Goldie's estate at $25,000.00.

A. K. worked for appellant from May through November, 1970, until he could draw his social security. This was part of the agreement. Apparently, in the latter part of 1970, appellant discussed the situation with attorney Robert Middleton who advised him that the agreement should be reduced to writing. Documents were prepared by Middleton and delivered by him to appellant and A. K. at the shop, A. K. then said he was going to take the agreement home and sign it. The documents, however, were never executed by either A. K. or Goldie, as far as the record shows. Middleton's office notes indicate that the document presented to A. K. was a warranty deed reserving a life estate to the longer liver of him and Goldie, and reserving $125.00 per month rents and profits to them, and an amortization of the taxes for the preceding year. Bob Gibson, at trial, testified that A. K. was concerned that if the business did not continue, as happened with Litten, that he would have to come back and take it over. This may account for the nonexecution of the warranty deed to appellant, that deed not being conditioned on the continuation of the business.

Prior to appellant's purchase of the business, A. K. offered the same proposition of monthly payments for the lifetimes of A. K. and Goldie with Kenneth Hartzfeld, after which the property would be his.

A. K. died in late 1971. On January 12, 1972, Goldie came into the Citizens State Bank with her brother. She was inquiring if the bank had in their records any signed deed or contract that would indicate that the property had been or intended to be deeded to either Litten or appellant. She was permitted entry into the safe deposit box to look for such papers, and her indication to Senior Vice President Chester Miller afterwards was that no papers were found.

At the trial Bob Gibson, a witness for appellant, testified on cross-examination that as far as he knew, Goldie never entered into any agreement with reference to the real estate—she was there with A. K., Mrs. Bowen and appellant at the place of business, but Bob did not overhear what was then said. On motion for new trial his additional testimony was taken. After the trial, in talking with his wife and "Stubby" Wilson, Bob recalled that after appellant and his wife left, Goldie and Bob were sitting in the garage drinking coffee or coke, and A. K. then told Goldie about what arrangements they had made with appellant, and she said, " 'Well, Woody whatever you think is best I'll go along with it.' One thing led to another and he says: 'Well, I made the same deal with Mr. Bowen that I had with Mr. Litten.' "

The trial court found that appellant's evidence was not sufficient to bind Goldie on the contract to transfer the real estate to appellant upon her death. "It is true that Mrs. Woodard was present on two occasions when A. K. announced the terms of the contract, i. e., that the real estate was to be conveyed to Lee upon the death of both A. K. and Mrs. Woodard, if Lee had continued to pay rent of $125 per month up to that time. Mrs. Woodard made no comment on either occasion. However, a written contract was contemplated by all the parties, and Mrs. Woodard would naturally suppose that she would have a later chance to consider the deal. There was no finality to it. I do not believe her silence on these occasions has the effect of binding her interest in this real estate. As to A. K.'s agency for Mrs. Woodard in making the agreement: Actually, this has not been contended by the plaintiff but the Court has considered it, anyway. There is no evidence at all that A. K. was expressly or impliedly empowered by Mrs. Woodard to bind her in this contract. Agency of husband for wife cannot be inferred from the marital relationship." Other facts and conclusions of law were found in favor of appellant: The actual existence of the contract between A. K. and appellant; appellant's full performance of his obligations under the contract; and that the contract was definite enough. These latter findings are fully satisfied by the evidence as between A. K. and appellant, and under the factual elements to be established in order to enforce an oral contract set forth in *Burgess v. Wright*, 565 S.W.2d 854, 856[2, 3] (Mo.App.1978).

■ It is true, as the trial court noted, that the agency of the husband for the wife cannot be inferred from the marital relationship (alone). *Henry v. Sneed*, 99 Mo. 407, 12 S.W. 663, 667 (1889); *Link v. Cox*, 529 S.W.2d 189, 191[4–6] (Mo.App.1975), where it was sought to connect wives to the fraudulent actions of husbands, the court saying: "But there was no evidence that either wife was aware of such source [of salaries paid them] or knew that the money was the product of their husband's fraud. The agency of the husband for the wife cannot be established merely by their marriage, but may be shown by circumstantial evidence. *Ethridge v. Perryman*, 363 S.W.2d 696 (Mo.1963) and *Murphy v. Olds*, 508 S.W.2d 249 (Mo.App.1974)."

■ The inquiry here is whether there is sufficient circumstantial evidence to show that A. K. acted for both himself and Goldie in making the business arrangement with appellant. It is clear from the whole record that A. K. alone managed the business. In fact, the further evidence is that Goldie rarely came to the carburetor and electrical shop. When he dealt with Litten, he did so alone; and when he approached Hartzfeld and offered him the same proposition as he had with Litten. Clearly, also, the propositions offered by A. K. to Litten, Hartzfeld and indeed to appellant, had reference to a joint benefit for their lifetimes of an income from the sale of the property. Goldie was present when the matters were discussed in the shop office with appellant and his wife—that is undisputed evidence. The question now becomes, although Goldie then made no comment, did her subsequent conduct and other circumstances show her acquiescence in the business arrangement so as to create an estoppel against her and bind her to A. K.'s dealings as her agent?

The evidence shows that Goldie was present on two occasions when the oral arrangement for the sale of the real estate conditioned upon a monthly payment for A. K.'s life and her life. She did not remonstrate, although she was bound to know that she held title to the property with A. K. as tenants by the entirety. Thus, there is some admission by her silence, she being present, and being interested, that she assented to the arrangement [see *Nelson v. Nelson*, 90 Mo. 460, 2 S.W. 413, 414 (1886), where statements made by a parent intestate in the presence of a child as to advancements to the child not then controverted by the child, were held admissible], although as stated in *Kelso v. C. B. K. Agronomics, Inc.*, 510 S.W.2d 709, 729[23, 24] (Mo.App.1974), such evidence should be received with caution and there must be a showing that there was a duty to speak. Other than Goldie's entirety interest in the property, there was here no further showing that she was under a duty to speak. But the circumstances do not there end. Thereafter, appellant remained in possession of the property, and pursuant to the oral contract, made payments to A. K. during his lifetime, and after his death, to Goldie alone. She accepted those payments and the only evidence is that those payments were referable to the contract, payable "as rent", as stipulated by A. K. in Goldie's presence.

In the case of *Hoffmann v. Hoffmann's Ex'r*, 126 Mo. 486, 29 S.W. 603 (1895), which was a suit by a widow upon an antenuptial contract with her deceased husband, it was sought to elicit from the widow's witness detailed statements made in her presence by the widow's former husband during his last sickness, ruled inadmissible. The court said, page 605: "That statements made by a third party in the presence and hearing of a party to a suit, and against his interest, and which were not disputed at the time, are, as a general rule, admissible against him, is not denied. Silence in such cases raises an inference from which acquiescence may be assumed, provided the 'statement is one which calls for action or reply.' (Citing authority and cases.) Admissions or declarations by a husband or wife in the presence of the other stand upon an entirely different footing. Generally speaking, at common law the husband and wife are not competent to testify against each other in contests with third persons. Much less could mere statements of one be used as evidence against the other. Neither, there-

fore, would one stand under obligation to dispute a statement made by the other, *unless the circumstances were such as would create an estoppel to deny it.* Besides, the very relation of husband and wife is such as should deter one from disputing, in the presence of strangers, an assertion made by the other." [Italics added.] See also *McCarty v. Bishop*, 231 Mo.App. 604, 102 S.W.2d 126, 129[6–9] (1937), alluding to exceptions to the general rule of evidence excluding testimony of silent acquiescence in the statements of one spouse to others in the presence of the other.

■ At 41 C.J.S. Husband and Wife § 70 p. 548, this statement is made: "While the agency of the husband for the wife is not to be implied from the fact that he may have undertaken an enterprise with a view to her benefit as well as his own, yet when a husband assumes to act for his wife and when his action naturally tends to accomplish her known wishes it needs but little evidence to warrant an inference that the action was authorized by her. Slight evidence of the agency of the husband for the wife is sufficient to charge her *where she receives, retains, and enjoys the benefit of the contract.*" [Italics added.] See *Vaughn v. Great American Insurance Company*, 390 S.W.2d 622, 627[10, 11] (Mo.App.1965), where the issue was whether the husband was acting as his wife's agent in cancelling an insurance policy, the court saying: "We agree that neither husband nor wife has the power to act as the other's agent merely by virtue of the marital relation, but the fact that a husband is habitually permitted by the wife to attend to some of her business affairs—which to us is the sense of Mrs. Vaughn's testimony—furnishes some basis for finding that he is authorized to attend to all of her business affairs. Restatement (Second), Agency § 22, comment b, p. 94." Here, from the totality of the evidence, it is clear that A. K. attended to all of their business, justifying an inference that he was authorized to act for Goldie in arranging the sale of the business and property for their joint benefit.

But, as noted, this is not all. In reliance upon the rather informal arrangement, appellant entered into possession of the property, made repairs thereon and paid the $125.00 per month to A. K. during his lifetime, and then to Goldie for her lifetime. In this situation she would have been estopped to deny the agency of A. K. for her, and would have been deemed to have ratified the arrangement made by him for their joint benefit, and respondent, standing in her place as executor, is likewise estopped. See 41 C.J.S. Husband and Wife § 296 p. 781, and *Ethridge v. Perryman*, supra, where a mistake of a husband was held attributable to the wife, in conveyance of entirety property, upon the theory that he acted as her agent, the court saying 363 S.W.2d at page 702. "There is nothing to indicate that she did not benefit from the loan. In these circumstances she is estopped to deny his authority to act as her agent in her behalf, and she is chargeable with her husband's knowledge and understanding of the true contract; her husband's mistake is her mistake and she is bound thereby and must assume full responsibility therefor. (Citing cases.)" After A. K.'s death, the evidence shows that Goldie went to the Citizens State Bank to inquire and search for a written instrument that would indicate the property had been intended to be deeded to either Litten or appellant. Upon finding none, there is no evidence to show that she remonstrated, but contrarily she continued to accept and retain appellant's monthly payments. This is further evidence of her ratification of the arrangement and of the estoppel to deny A. K.'s agency for her. The facts here constitute an exception to the general rule of inadmissibility of statements made by one spouse to others in the presence of the other spouse who then voices no objection.

■ Respondent urges that the matters of apparent authority, ratification and estoppel were not pleaded, as usually is required. It is unnecessary to pursue the contention because evidence bearing upon those matters was received without objection. Under Rule 55.33(b), the pleadings may therefore be treated as having been

amended. See *Kreutz v. Wolff*, 560 S.W.2d 271 (Mo.App.1977).

The above evidence, without the additional after-trial testimony of Bob Gibson, is clear and convincing beyond a reasonable doubt that appellant is entitled to the relief for which he prays. The credibility of Gibson, as to which version of the facts was true, was for the trial court to determine. *Estate of Sheets v. Sheets*, 558 S.W.2d 291, 296[7–9] (Mo.App.1977).

With respect to Goldie's assent to A. K.'s arrangement, considering her continued receipt of benefits thereon, and the evidence bearing upon agency, ratification and estoppel, it must be held upon a firm belief that the judgment of the trial court is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 31 (Mo. banc 1976).

The judgment is reversed and the case is remanded with directions to enter a decree of specific performance for appellant, either by directing respondent to execute an executor's deed to the property, or to effect a transfer of the title to the property by the court's decree. §§ 511.280, 511.300, RSMo 1978.

All concur.