In the Matter of Lyle DeWayne **RICHARDSON** and Nellie Jane **Richardson, Debtors.**

**UNITED STATES of America, FARMERS HOME ADMINISTRATION, Plaintiff,**

v.

**Darold W. JENKINS, Defendant.**

**Bankruptcy No. 84–01253–SJ–W–7.**

United States Bankruptcy Court, W.D. Missouri, St. Joseph Division.

June 28, 1985.

Opinion on Reconsideration Aug. 9, 1985.

David Detar Newbert, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

Darold W. Jenkins, Independence, Mo., for debtor.

ORDER DENYING THE PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY'S FEES FROM THE DEFENDANT

DENNIS J. STEWART, Bankruptcy Judge.

Formerly, the plaintiff filed an adversary action in this court to reclaim certain chattels in which it claimed a valid and perfected security interest. See *United States of America v. Richardson*, Adversary Action No. 85-0101-3 (Bkrtcy.W.D. Mo. April 15, 1985). As the issues arose and were adjudicated by this court, they materially and principally involved the debtors' contention that the plaintiffs' security interest was not perfected because there was no manual signature of the plaintiff on the financing statement. The evidence demonstrated, however, that there was a typewritten signature. Under the governing law of the State of Missouri, this court therefore found and concluded in its findings of fact, conclusions of law and judgment issued on April 15, 1985, that the security interest was in fact perfected. The following passage therefrom embodies the reasoning employed by the court in that case:

"The debtors' only contention as to absence of perfection is that the secured party did not sign one financing statement and signed another only by a secretary. But these contentions evaporate in light of the plain letter of the law ... See, e.g., *Darr v. Brennan Cattle Co.*, 658 S.W.2d 906, 909 (Mo.App.1983), to the following effect:

"The only reasonable attack which could be made on the technical sufficiency of the Bank's security interest would be that the financing statement in this regard was not manually signed by the Bank as secured party. However the deficiency of the financing statement in this regard has been cured by the typewritten designation of the Bank as secured party and the Bank's authentication of that designation by filing the financing statement. *Benedict v. Lebowitz*, 346 F.2d 120 (2nd Cir.1965); *Matter of Save-On-Carpets*, 545 F.2d 1239 (9th Cir.1976); *Peoples Bank of Bartow County v. Northwest Ga. Bank*, 139 Ga.App. 264, 228 S.E.2d 181 (1976); *In re Horvath*, (D.C.Conn.1963), 1 UCC Reporting Service 624.'"

The plaintiff now contends, in a motion to assess attorney's fees against the counsel for the debtors, that the contention of nonperfection was frivolous; that accordingly the debtor's counsel could not have signed the pleadings which raised such a frivolous contention in good faith within the meaning of Rule 11 of the Federal Rules of Civil Procedure; and that, therefore, sanctions are appropriate within the meaning of that rule in the form of attorney's fees.[1]

---

1. The motion of the United States purports to provide two separate bases for imposing the attorney's fees against counsel for the defendants. The first is Rule 11 of the Federal Rules of Civil Procedure, which requires that counsel's signature on a pleading be construed to mean "that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law" and further provides that: "If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it ... an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee." The other potential

■ The modern bankruptcy court is met, at the outset, with the issue of jurisdiction. The Bankruptcy Amendments and Federal Judgeship Act of 1984 charges the bankruptcy judge with the duty of determining the court's jurisdiction at the commencement of the case *sua sponte* when the issue is raised by no other party.[2] In this action, the request is for recovery of attorney's fees from the attorney for the debtor. Both of the litigants are thus strangers to the estate in the sense that neither of them is either a trustee or a debtor. Further, the property sought to be recovered—a simple money judgment against the debtor's counsel—is not property of the estate, nor is it in any way apt to result in roundabout depletion of the estate. It must be observed that, in this sense, the action now before the court is wholly different from an action to recover attorney's fees paid by the debtor to the debtor's attorney or to determine the amount of such fees payable to the debtor's attorney from the estate.[3] Such subject matter is wholly within the jurisdiction of a bankruptcy court. But the action before this court does not involve monies or property which have been, are now, or will be within the actual or constructive possession of the bankruptcy estate. Traditional bankruptcy jurisdictional principles have been to the effect that bankruptcy court jurisdiction does not exist in such a case. Even when consent was recognized as a valid basis for subject matter jurisdiction, it was held that "consent cannot operate to confer jurisdiction on the bankruptcy court as to a claim asserted by strangers to the proceedings over a matter in no way connected with the administration or distribution of the bankrupt estate." 2 Collier on Bankruptcy para. 23.08, p. 534 (14th ed. 1976). And even when bankruptcy court jurisdiction was at its very zenith, in the halcyon days of section 1471(c), Title 28, United States Code, it was still held that there was no statutory basis for bankruptcy court jurisdiction when two strangers to the estate joined an issue not related to administration or distribution of the estate. See *In re Systems Marketing Consolidated,* 19 B.R. 519, 8 B.C.D. 1335 (Bkrtcy.N.D. Ill.1983).

If the sanctions which were requested were not a money judgment, in substance, the chances of bankruptcy court jurisdiction might be better. But the powers to impose the sanctions which are provided for in Rule 11 and elsewhere are conferred exclusively on the district court except as they may see fit to confer them on the bankruptcy court by local rule.

The plaintiff may therefore, it seems, request disciplinary action by the district court on matters which sound in the general professional responsibility of the defendant. But it appears that there is no independent jurisdiction in the district court to award the attorney's fees requested. In acting as a court of bankruptcy on substantive matters, the district court may be said to act generally within the same confines of jurisdiction as the bankruptcy court. Its jurisdiction is generally restricted to matters affecting administration and distribution of the bankruptcy estate which the law has placed in its actual and constructive

---

ground cited is the inherent power of a court to assess attorney's fees against counsel who act in "bad faith, vexatiously, wantonly, or for oppressive reasons," as set out in *Roadway Express v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). But the bankruptcy court does not have any "inherent powers." Rather, it has only such powers as are delegated by the district court. *Lindsey v. Ipock,* 732 F.2d 619, 624 (8th Cir.1984) Section 157(a), Title 28, United States Code.

**2.** "The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." Section 157(b)(3), Title 28, United States Code.

**3.** Such actions have the status of claims against the estate within the meaning of section 157(a)(2)(B), Title 28, United States Code. Recovery of attorney's fees from attorneys for a trustee or debtor or creditor has as its supreme purpose the prevention against "roundabout depletions of the estate." Advisory Committee's Note to Rule 219 of the former Rules of Bankruptcy Procedure.

possession.[4] Otherwise, because of the abstention statutes, absent an independent nonbankruptcy basis of jurisdiction, district court jurisdiction as to "related" cases is but an evanescent and fleeting thing.[5] And it does not appear that there is an independent basis of federal district court jurisdiction, insofar as the definitional limits imposed by section 1331, Title 28, United States Code, are not met.[6]

■ But, separately and independently, even if this court should be deemed to have the jurisdiction and power necessary to grant the monetary award and impose the discipline on defendant's counsel which is sought by plaintiff, this would not be an appropriate case for it. The actions of counsel for the defendant in raising the defense of nonperfection did not constitute "bad faith" within the meaning of *Roadway Express v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), and *Davidson v. Allis Chalmers, Inc.*, 567 F.Supp. 1532 (W.D.Mo.1983). In this case, the standards for determining the crucial issue of perfection *vel non* of the security interest were not as "easily ascertainable" as were the material and governing standards in *Piper, supra*, and *Davidson, supra*. It is true that, at the time of the trial of this action, the rule that it was not a necessary prerequisite to perfection that a secured party manually sign the financing statement was in the ascendancy. But it had had a difficult and uncertain nascence. In *Matter of Save-On-Carpets of Arizona, Inc.*, 545 F.2d 1239 (9th Cir.1979), for instance, one of the cases relied upon by the Missouri Court of Appeals in *Darr v. Brennan Cattle Co., supra*, both the bankruptcy court and the district court had held a manual signature to be necessary. But the appellate court reversed on the grounds that:

> "The appellant's intent to authenticate the financing statement is objectively manifested by the direction that its corporate name and its credit manager's name be typed in the appropriate spaces, and by the submission of the financing statement to the Arizona Secretary of State for filing. Any other interpretation would be contrary to commercial experience and our knowledge of business practices." 545 F.2d at 1240.

And see *Matter of E.A. Fretz Co., Inc.*, 565 F.2d 366, 373 (5th Cir.1978), adopting the reasoning of *In re Murray*, 2 U.S.C.Rep. 667 (D.Ore.1964), to the effect that signature by all secured parties was a *necessary* prerequisite to perfection. See also *Sommers v. International Business Machines*, 640 F.2d 686, 691–692 (5th Cir.1981) ("(I)n *In re E.A. Fretz Co., Inc., (supra)* ..., when faced with a financing statement that had not been signed by the secured parties ..., this court held the non-signing secured parties' interest in the collateral to be unperfected.") So the issue could not be regarded as free from all doubt and, accordingly, Mr. Jenkins can, under such circumstances, hardly be considered as acting irresponsibly to request the court to act on general legal principles which he may have felt—with some reason, it appears from the foregoing—outweighed the last holding from the Missouri Court of Appeals.

■ This court does not presume to declare which of the two conflicting rules is correct, nor to deny that state law controls the issue of perfection. That principle, indeed, is so well settled that it requires no citation of authority. And it is also true that the holding in *Darr v. Brennan Cattle Co., supra*, was plainly and unequivo-

---

**4.** See section 1334(d), Title 28, United States Code.

**5.** Even if mandatory abstention is arguably not applicable to require a matter brought to recover a money judgment to be remitted to a state court, permissive abstention under section 1334(c)(1), Title 28, United States Code, seems likely to be invoked in cases in which the slightest doubt arises.

**6.** Procedural rules do not ordinarily amount to laws of the United States within the meaning of section 1331. Procedural rules do not ordinarily create substantive rights within the meaning of that section.

cally expressed. But the subject of perfection of security interests is one on which the law changes from time to time, and it is not unusual for the state courts to reconsider and modify or even repudiate their holdings on this subject. See, e.g., *United States v. Oakley*, 483 F.Supp. 762, 764 (E.D.Ark.1980), in which it was noted that the prior decisions of the Arkansas Supreme Court on the issue of sufficiency of description in a financing statement were not uniform. The provisions of the modern Uniform Commercial Code have gone far to simplify and make definite the requirements for filing and perfection. But there is still enough vagueness in standards utilized to determine when there is an intention to authenticate a financing statement to permit a great range of decisions. If we accept the principle, for instance, that state law controls the issue of perfection, then how could it be doubted that, when a husband and wife both sign a security instrument and the husband signs the financing statement and both accept the benefits of the transaction, the husband's signature on the financing statement is sufficient for perfection? State law has long and unequivocally held that only the slightest evidence of the husband's agency "is sufficient to charge (the wife) where she *receives, retains, and enjoys* the benefit of the contract." *Bowen v. Loyd*, 589 S.W.2d 312, 317 (Mo.App.1979). See also *Murphy v. Olds*, 508 S.W.2d 249, 253 (Mo.App.1974). Yet, the unsettled character of that question in the federal courts is so well known that no citation of authority is necessary to document it.

It is not to be said that this court means to encourage instability and uncertainty in the law. But, in determining whether to discipline an attorney for the type of actions or defenses which he brings, that instability must be accepted as a fact if and when it exists. Further, as Judge Bartlett clearly stated in *Davidson v. Allis-Chalmers Corp., supra,* at 1543, "(c)ounsel should not be penalized for asserting a novel theory." The law must and should develop to meet the changing conditions of commerce and of human existence and to discipline counsel for asserting "a novel theory," without more, would stunt and stultify the entire process of beneficial and necessary development.

Accordingly, for the separate and independent reasons (1) that this court lacks jurisdiction of it and (2) it is without merit as a matter of law, it is hereby

ORDERED that plaintiff's "motion for attorney's fees" filed on April 29, 1985, be, and it is hereby, denied.

## ON MOTION FOR RECONSIDERATION

The undersigned formerly entered an order on June 28, 1985, denying the motion of the Farmers Home Administration for an award of attorney's fees against Darold R. Jenkins, Esquire, for alleged absence of good faith in raising a defense of imperfection of the plaintiff's security interest. The denial of the motion was based upon two principal grounds: (1) lack of bankruptcy court jurisdiction and (2) the presence of arguability in the defense which was raised by Mr. Jenkins on behalf of the debtors. The Farmers Home Administration now moves for reconsideration of that order, asserting error in both of the positions taken by this court. The motion for reconsideration will be denied for the reasons stated in the following paragraphs.

### *Jurisdiction*

■ The primary focus of the Farmers Home Administration in its motion for reconsideration is that this court erred in the order now under challenge in holding that it did not have jurisdiction. Its contention is that bankruptcy court jurisdiction might well have been founded upon section 1927, Title 28, United States Code, which gives any "court of the United States" authority to make awards of costs, expenses, and attorney's fees for vexatiously multiplying litigation. The trouble with this contention is that the bankruptcy court has not been previously thought to be a "court of the United States" within the meaning of that section. It has, in fact, been uniformly held that bankruptcy courts do not come

within the definition of a "court of the United States." That expression is defined in section 451, Title 28, United States Code, as including only "the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior." This definition has been said by higher courts to exclude the bankruptcy court. "Bankruptcy Courts are not included in this enumeration and they are not courts whose judges hold office during good behavior. This suggests that they are not courts of the United States ..." *Matter of Becker's Motor Transp., Inc.*, 632 F.2d 242, 247 (3d Cir.1980). A "court of the United States," in its technical sense, is one created under Article III of the Constitution. *United States v. George*, 625 F.2d 1081, 1087 (3d Cir.1980). And "the provisions of Title 28 relating to 'courts of the United States' (are) applicable to Article III courts" and, insofar as the provisions of that title authorize awards of attorney's fees, they authorize "an award of attorney's fees only by an Article III court." *Bowen v. C.I.R.*, 706 F.2d 1087, 1088 (11th Cir.1983). From these authorities, it would appear that the bankruptcy court is not granted authority to impose attorney's fees for vexatious and multiple filings within the meaning of § 1927, Title 28, United States Code.

It has been suggested in other contexts that the district court may, with respect to a proceeding which is a core proceeding under the provisions of § 157, Title 28, United States Code, refer the issue of attorney's fees under § 1927, Title 28, United States Code, to the bankruptcy court for hearing and determination. But, for the reasons stated above, the action for attorney's fees itself, based on a power exclusively conferred on an Article III court, cannot be considered as a core proceeding. Nevertheless, some have asserted that the bankruptcy court may hear the matter and render a report and recommendation for final order or final judgment to the district court as provided in §§ 157(b)(3) and (c), Title 28, United States Code.[1] In another attorney-discipline matter, however, *Matter of Wallace*, 46 B.R. 807 (Bkrtcy.W.D.Mo. 1984), this court rendered such a report and recommendation to the district court, which nevertheless determined that the matter should be heard *de novo* by that court, as if never previously heard.[2] Virtually nothing could suggest more strongly that the bankruptcy court was without jurisdiction and power to hold the hearing and make the report and recommendation.[3]

In its motion for reconsideration, the Government appears to contend that its former motion for an award of attorney's fees was predicated on much more than the raising of an allegedly frivolous defense to its complaint for recovery of chattels in this adversary action; that there were other tactics employed by the debtors' counsel which were dilatory and vexatious and designed to multiply the proceedings. These actions seem to have consisted of Mr. Jenkins' statements in the course of a meeting of creditors and a Rule 2004 examination which are said to have been less than polite

---

**1.** Section 157(b)(3) provides that "(t)he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." Section 157(c)(1) provides that "(a) bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court after considering the bankruptcy judge's proposed findings and con-

clusions and after reviewing de novo those matters to which any party has timely and specifically objected."

**2.** A district court order to this effect was entered on June 7, 1985. In providing for a de novo hearing, it further stated that, "(b)ecause the hearing will be de novo, the movant's 'Amended Proposed Findings of Fact and Conclusions of Law' filed May 29, 1985 are insufficient as they are simply an adoption of the previous orders of the Bankruptcy Court."

**3.** See note 2, *supra*.

and responsive to counsel for the Government and to have been calculated to delay the Government's right to possession of the property in which it had a security interest. Insofar as this contention may be intended to evoke the general and inherent contempt powers of the bankruptcy court, it can only be said that recent higher court authority, decided in the wake of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), has made it clear that there is no such inherent contempt power residing in the bankruptcy court. In *Matter of Wallace, supra,* our district court has made it clear that, even though the factual basis for a contempt may arise in or in connection with bankruptcy proceedings, the bankruptcy court has no power even to make recommended findings to the district court. The proceedings must commence in the district court.

Counsel for the government, in the motion for reconsideration which is now before the court, observes the anomaly which this status of the law creates—the bankruptcy court is charged with the duty of rendering certain orders and judgments and with controlling the proceedings before it, but is seemingly wholly without power to enforce or effectuate the orders and judgments which it has the responsibility to issue. With some sense of justifiable outrage, counsel for the Government opines that "the system would not work" if actions based upon counsel's derelictions before the bankruptcy court must be brought to other courts.

There is a great deal of empirical sense to this observation. But it is to be remembered that, in carving out exceptions to the rule of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co., supra,* Congress

and the higher courts had to be circumscript in delegating powers to the bankruptcy court lest they by indirection confer Article III powers on the bankruptcy court. Accordingly, the bankruptcy court must be circumscript in interpreting the law delegating powers to it lest it be accused of arrogating Article III powers to itself. And it is precisely the power to enforce and effectuate its orders and judgments which is said, in the aftermath of the *Marathon* decision, *supra,* to distinguish the Article III court from the non-Article III court. See *Kalaris v. Donovan,* 697 F.2d 376, 388 (D.C.Cir.1983), to the following effect: "The [Benefits Review] Board does not have the ... power to punish anyone for contempt ... The Board possesses only limited powers to issue compensation orders and it must resort to an appropriate District Court to have its orders enforced ... In sum, the removed members have not shown that the 1972 amendments created an Article III Court ..." [4]

Thus, if the law is interpreted to grant the bankruptcy court the power to enforce and effectuate its own orders and judgments, the effect of such an interpretation may well be to confer Article III status on the bankruptcy courts. It has historically been held that the designation placed by Congress on a court as an Article III court or a non-Article III court is not controlling; the question is whether any of the federal judicial power is conferred upon the court in question. "In determining the constitutional character of the Court of Claims and the Court of Customs and Patent Appeals ..., we may not disregard Congress' declaration that they were created under Article III ... [but] Congress may not by fiat overturn the constitutional decisions of this Court." *Glidden Company v. Zdanok,*

---

**4.** Aside from the power of contempt, it seems to be within contemplation of the current law that the bankruptcy court have the power to enforce its own judgments. See, e.g., Rule 7069 of the Rules of Bankruptcy Procedure, making the execution procedures of Rule 69, F.R.Civ.P., applicable in adversary proceedings in bankruptcy. The "court" within the meaning of that rule "means the court of bankruptcy as defined in section 1(10) and created under section 2a of the Act and the United States Bankruptcy Court created under 28 U.S.C. section 151." Rule 9001(2), Rules of Bankruptcy Procedure. Otherwise, also, the current bankruptcy court has the powers which the Benefits Review Board in the *Kalaris* case did not have and which are mentioned in the *Kalaris* case, namely the powers to compel attendance at examination at hearings and examinations through use of the subpoena power.

370 U.S. 530, 541, 82 S.Ct. 1459, 1468, 8 L.Ed.2d 671 (1962). It has historically not been the status of the judges of a court which determine the status of that court; rather the converse is so—the status of the court determines that of its judges.

"If it were plain that these judges were invested upon confirmation with Article III tenure and compensation, it would be unnecessary for present purposes to consider the constitutional status of the Court of Claims and the Court of Customs and Patent Appeals ... [but] the constitutional quality of tenure and compensation extended Judges Madden and Jackson at the time of their confirmation must be deemed to have depended upon the constitutional status of the courts to which they were primarily appointed."

*Id.* at 538, 540, 541, 82 S.Ct. at 1466, 1467, 1468.

"[T]he District Court employed the wrong test for determining whether Congress had created an Article III court ... [that test] comes 'dangerously close to saying that Article III courts are those with Article III judges ...' [and] all of the opinions filed in the Court's latest Article III case, *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] ... (1982), agree that it is not what Congress says but what powers Congress vests in the adjudicatory body that counts."

*Kalaris v. Donovan*, 697 F.2d 376, 385 (D.C. Cir. 1985).

In accordance with this guiding principle, it has in the past been held that a court initially created as a non-Article III court may "mature" into an Article III court by reason of being assigned a portion of the federal judicial power.

"[P]rior to 1953 the Court of Claims had all of the characteristics of an Article III court—jurisdiction over justiciable matters, issuance of final judgments, judges appointed by the President with consent of the Senate—save as to the congressional reference matters ... Since that time the Article III jurisdiction of the court has been enlarged ... I see noth-

ing in the argument that the 1953 and 1958 Acts so changed the character of these courts as to require new presidential appointments. Congress was merely renouncing its power to terminate the functions or reduce the tenure or salary of the judges of the courts. Much more drastic changes have been made without reappointment."

*Id.* at 586, 587, 589, 82 S.Ct. at 1491, 1492, 1493. And if a court does mature in such a manner, it is clear that its judges become Article III judges, without the necessity of reappointment, regardless of the character of their initial appointment. *Id.* See also *Booth v. United States*, 291 U.S. 339, 54 S.Ct. 379, 78 L.Ed. 836 (1934).

Accordingly, it is clear that, if this court should assert that it has jurisdiction and power to enforce its orders by means of contempt proceedings or other sanctions, it would be seen as the bankruptcy court's arrogating Article III powers to itself in violation of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra.*

It is necessarily, in light of the foregoing principles, the precise or tacit assumption of the decisional authorities relied on by the Government, which hold the provisions of § 1927, Title 28, United States Code, applicable to the bankruptcy court, that the bankruptcy court is a "court of the United States," i.e., according to the foregoing authorities, an Article III court. It must be admitted that there is ample precedent for concluding that the bankruptcy court must have, by this time, as a constitutional imperative, "matured" into an Article III court. Twenty years ago, the standard for determining this issue was simply whether, in any part, a court's business was "judicial," i.e., capable of resolution only by a court and incapable of determination by legislature or administrative action. *Kalaris v. Donovan, supra.* Thus, if the decisions rendered by a federal court were properly in controversies judicially cognizable between litigants and were not comprised wholly of issuing advisory opinions or adjudicating "public rights," the federal

court was required to be recognized as an Article III court.

> "[T]he Court of Claims [and] the Court of Customs and Patent Appeals ... are not tribunals ..., a substantial and integral part of whose business is nonjudicial. The overwhelming majority of [their] business is composed of cases and controversies."

*Glidden Company v. Zdanok, supra,* 370 U.S. at 582, 583, 82 S.Ct. at 1489, 1490. In asseverating this principle, the Supreme Court of the United States, in *Glidden Co. v. Zdanok, supra,* relied in part upon the Court of Claims opinion in *Pope v. United States,* 53 F.Supp. 570, 100 Ct.Cl. 375, *rev'd,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3, stating as follows in doing so:

> "The judges of these two courts have never accepted the dependent status thrust at them by the [*Ex parte*] *Bakelite [Corp.,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789] and *Williams [v. United States,* 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372] decisions. See e.g., Judge Madden writing for the Court of Claims in *Pope v. United States,* 53 F.Supp. 570, 100 C.Cl. 375, *rev'd,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3. The factors set out at length in this opinion, which were not considered in the *Bakelite* and *Williams* opinions, make plain that the differing conclusion which we now reach does no more than confer legal recognition upon an independence long exercised in fact."

370 U.S. 584, 82 S.Ct. at 1490. The *Pope* case, in turn, classified the duties of the Court of Claims to be judicial simply by reason of their being subject to review in Article III courts. Judge Madden's now famous words in that case were as follows:

> "We do not attempt to explain the decision in the *Williams* case [holding the Court of Claims not to be an Article III court], because, and we say it with deference, we do not pretend to understand it. In any event, the language of the Supreme Court in the *Williams* case, and the fact that that language was uttered in the course of the decision of a case certified to the Supreme Court by this court, would seem to leave no room for doubt that this court is a court in fact as well as in name, and that its decisions are judicial decisions. If it were not, the Supreme Court would not review its decisions, as it does, and has done since the amendment, in 1866, 14 Stat. 9, of the statute defining the jurisdiction and powers of this court ... And we would suppose, unless the decision in the *Williams* case means the contrary, that we are no more acting as a mere agent or arm of the legislature, when we decide our cases in the first instance, than is the Supreme Court, when it, under the appellate procedure prescribed in the statute, decides them finally. Each court is assigned its place in the process of doing justice between the United States and those who have claims against it. That is the major portion of this court's assignment. It is only a small part of the Supreme Court's assignment. But one, when it is performing that assignment must be acting judicially, if the other is."

53 F.Supp. at 573. Judged by this simple, straightforward and sensible standard, the claim of the current bankruptcy court to Article III status is many times greater than that of the Court of Claims, which is a legislative court, a species of tribunal which has traditionally been recognized as an exception to the rule that the federal judicial power can be conferred only on Article III courts.[5]

---

5. It is seemingly made clear in 1 Moore's Federal Practice para. 0.4(1), p. 74, that when a court's duties include the federal judicial power, unless that court is a legislative court, a court martial, or a territorial court, it is to be an Article III court. "(A) court that exercises jurisdiction over cases and controversies within Article III, but also over matters not within Article III, is a hybrid court, partaking of both types ..., but ... in the case of the territorial courts, because of their ephemeral character, they may be created as legislative courts." *Id.* And, with respect to legislative courts, such as the Court of Claims and the Court of Customs and Patent Appeals, they can be characterized as either "a legislative or constitutional court at the discretion of Congress." *Id.* "We may and do assume, for present purposes, that none of the jurisdiction vested in (the Court of Claims and the Court of Customs and Patent Appeals) is

The plurality opinion in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra,* seems to have continued to apply the same standard, holding that, in the federal system, only three types of federal courts—territorial courts, courts-martial, and legislative courts—have been looked upon as exceptions to the rule that the federal judicial power may only be exercised by Article III judges.

But the district and appellate court decisions which have interpreted the *Marathon* decision, *supra,* have limited its rule to an "effective" holding that it is only actions arising under state law which, in the federal system, must be determined by an Article III court; federally-created actions, it is said, may constitutionally be relegated to determination by sub-Article III courts. "[T]he Court has never indicated that all

*federally* created private rights must be adjudicated in Article III courts. *Northern Pipeline* effectively held that certain private state law claims, when adjudicated within the federal system, must be decided by Article III courts." *Kalaris v. Donovan, supra,* 697 F.2d at 386. The narrowness of such a standard would seem itself to hold the potential for evisceration of the content of Article III.[6] But even measured by such a rigid standard, the current bankruptcy court, under the Bankruptcy Amendments Act and Federal Judgeship Act of 1984, has the responsibility of determining actions which clearly arise under state law, most prominently claims against the estate,[7] including those underlying dischargeability determinations,[8] which comprise the staple of bankruptcy court judicial business. It may be true, as decisional authori-

(inherently judicial business), so that all of it might be committed for final determination to non-Article III tribunals, be they denominated legislative courts or administrative agencies. But because Congress may employ such tribunals assuredly does not mean that it must." *Glidden Co. v. Zdanok,* 370 U.S. 530, 549, 82 S.Ct. 1459, 1472, 8 L.Ed.2d 671 (1962). If the judicial power is conferred upon the bankruptcy court in any respect, however, it would appear that the Congress must consider it a constitutional court, when "Congress did not constitute the bankruptcy courts as legislative courts." *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 2867, 73 L.Ed.2d 598 (1982).

**6.** As the plurality opinion in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 2872, 73 L.Ed.2d 598 (1982), observed: "The flaw in (this) analysis is that it provides no limiting principle. It thus threatens to supplant completely our system of adjudication in independent Art. III tribunals and replace it with a system of 'specialized' legislative courts."

**7.** See, e.g., *Sapp v. Naughton,* 44 B.R. 670, 672, 673 (Bkrtcy.W.D.Mo.1984), to the following effect: "Some cases decided in the wake of the ruling in *Marathon* ... have stripped the holding to an 'effective' one which is only that actions arising under state law and which, absent bankruptcy, would be triable in state courts are forbidden to be tried and determined by bankruptcy judges bereft of Article III status. See, e.g., *Kalaris v. Donovan,* 697 F.2d 376, 386 (D.C.Cir. 1983), interpreting that *Marathon* ... 'effective-

ly held that certain private *state* law claims, when adjudicated within the federal system, must be decided by Article III courts.' (Emphasis in original.) Even if the *Marathon* holding is so restricted, however, at least part of the determination which a bankruptcy court must make in the process of adjudicating dischargeability *vel non* is a matter arising under state law. That is the issue of the existence or nonexistence of the underlying debt, which is necessarily an issue arising under state law. 'What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.' *Vanston Bondholders Protect. Com. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). And see also 1A Collier on Bankruptcy section 17.28A, p. 1742.6 (1976), in which it is noted that 'the suit in the state court would be *on the debt'* (emphasis in original), but that, ordinarily, in bankruptcy proceedings to determine dischargeability and with respect to invoking a right to jury trial, '(t)he matter of the debt is somewhat extraneous, albeit important, and may be considered incidental to the main issue.' But, in the light of the *Marathon* decision, ... can the determination of the existence of the debt be considered incidental to the main issue for the purpose of determining when the federal judicial power is engaged?" And the dischargeability issue itself is so bound up with state law that the dischargeability statutes can faithfully be said to be based upon state law themselves. See *Matter of Naughton, supra,* at 671.

**8.** See note 7, *supra.*

ty is now quick to point out,[9] that, by absorption, those state-created actions are now part of the bankruptcy law; therefore, they hold that such claims arise under bankruptcy law rather than under state law.[10] But, if such hybrid forms of action, which represent state actions made over by federal statute into federal actions, are to be discounted in determining the character of a court, then it is doubtful that the district court itself can be regarded as determining any actions which arise under state law.[11] For state claims underlying diversity actions are as surely absorbed into federal law by § 1332, Title 28, United States Code, as those underlying dischargeability claims are absorbed into federal bankruptcy law by § 523, Title 11, United States Code. If, through sophistical artifice, it can be seen otherwise, then we perhaps should ask ourselves why the creditor seeking reduction of his claim to judgment should be entitled, by reason of the accident of his debtor's bankruptcy, to trial and judgment by a lower-caliber court than that to which he otherwise would have been entitled. Why, in the matter at bar, should the fairly momentous question of Mr. Jenkins' personal liability and potentially the entire issue of his standing at the bar and his means of livelihood be determined by a judicial officer who has what are ordinarily regarded as inadequate protections as to salary and tenure? Or, looked at from an opposite point of view, why should the Government's cause be determined by a judicial officer whose future might well be rendered uncertain by the hostility of the private bar?

For the foregoing reasons, even measured by the narrow post-*Marathon* standards, it would seem that, under the Bankruptcy Amendments and Federal Judgeship Act of 1984 and decisional authority, the bankruptcy court has been in fact assigned a portion of the federal judicial power. Under the long recognized authorities, this would seem to have upgraded the status of the bankruptcy court.[12]

But, as observed above, the bankruptcy court must be circumspect in making any conclusions in this regard. In the area of classification of courts, "(the Supreme) Court's considered practice (is) not to apply *stare decisis* as rigidly in constitutional as in nonconstitutional cases." *Glidden Co. v. Zdanok,* supra, 370 U.S. at 544, 82 S.Ct. at 1469. And, generally speaking, the making of constitutional decisions must be left to higher courts.[13] This court there-

---

**9.** See, e.g., *In re Kaiser,* 722 F.2d 1574 (2d Cir. 1983), dealing with a case in which a trustee imposed a constructive trust on certain property as a result of its having been fraudulently transferred. The transferee contended that an action to impose a constructive trust was not, in substance, a "core" proceeding within the meaning of the former interim rule. The court answered that "(t)he Rule ... explicitly states that an action to impose a constructive trust is not related proceeding, although an action to impose a constructive trust, viewed by itself, is one which could be brought in a state court. It is certainly true that state courts commonly impose constructive trusts. What appellant ignores, however, is that this action was brought as a result of his fraudulent transfers in light of the bankruptcy laws ... The present action is not a 'traditional' action to impose a constructive trust upon real estate. It has no life of its own in either state or federal common law or statute independent of the federal bankruptcy laws. This action is not a related proceeding for the purposes of section (d)(3)(A) of the Rule or for constitutional purposes." But when a creditor would have a right to judgment in a state court on a state-law action absent bankruptcy, is it constitutional to deprive him of a right to jury trial because a dischargeability issue is now joined with the state-law claim and, by the same token, to also deprive him of trial before a judge having the general competence, salary and tenure of an Article III judge? This question is especially a potent one when the dischargeability issues are nearly all themselves determined by reference to state law.

**10.** See note 9, *supra.*

**11.** And if this is so, the lack of a limiting principle would threaten the Article III court system. Cf. note 6, *supra.*

**12.** See pp. 534–35 of the text of this memorandum, *supra.*

**13.** "(T)rial courts should limit the exercise of their power to declare acts of Congress unconstitutional to cases in which such unconstitutionality is clear, such power belonging peculiarly to appellate courts." *In re Royal-Wilhelm Furniture Co.,* 23 F.Supp. 993, 994 (W.D.Mich. 1938).

fore declines to find that it is a "court of the United States" within the meaning of section 451, Title 28, United States Code, which is empowered to assess awards of attorney's fees and costs provided in section 1927 of the same title.

### The Alleged Absence of Arguability in defenses

The Farmers Home Administration, in its motion for reconsideration, also raises the issue that the governing state law was clear and unquestionable and was contrary to the defense raised by Mr. Jenkins on behalf of the debtors. Thus, it argues, his raising of the defense was vexatious and dilatory. But this court considers this issue adequately covered by the former order denying the request for attorney's fees. Although the law was clear, the considerations underlying it were arguable, based on decisions which emanated from other jurisdictions. Admittedly, these decisions were not binding in the action at bar, but they were instructive on the point of whether it should have been considered hopeless and futile to argue for a change in the existing law. Because the other decisions contain some logic of their own, this court was justified in concluding that the defense interposed by Mr. Jenkins on behalf of the debtors was not wholly frivolous.

The Farmers Home Administration now, however, goes further, and states that the attorney for the debtors should have known that he did not have standing, on behalf of the debtors, to raise the defense, under the rule of *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984). Again, however, although the rule of the *Hamilton* decision is the clear and undoubted law in the St. Joseph division of this district and this court considers itself bound by its holding, its principles are at least as debatable as those which governed the question of perfection. In the *Hamilton* case, the bankruptcy court responded to a request of a debtor to determine the status of a junior lienholder under section 506 of the Bankruptcy Code which permits a determination to be made

of the extent to which a creditor is secured and to which he is unsecured. It was clear that, if the junior lienholder's balance, when added to that of the senior lienholder, was less than the value of the property, the equity may have been claimed as exempt by the debtor. There thus seemed to be some reason for the bankruptcy court to make the requested determination. See, e.g., Butler, *Valuation of Secured Claims under 11 U.S.C. 506(a),* 89 Commercial Law Journal 342, 343 (August-September 1984) to the following effect: "Under Section 506(d), to the extent that a lien securing a claim is found to *exceed* the *value* of the bankruptcy estate's interest in the property, that part of the lien is *void* and that part of the claim is *unsecured.* It should be noted that if a party in interest does not request a valuation of the claim secured by the lien and the lien is not avoided under any other section of the Bankruptcy Code, the lien remains enforceable *in rem* in spite of a discharge in bankruptcy." (Emphasis in original.) But, on the basis of the bankruptcy court's finding that the total balance due exceeded the value of the property, the district court concluded that the bankruptcy court was without authority to make any finding of the extent to which the junior lienholder was secured and the extent to which it was unsecured. The district court held that to do so would constitute the unauthorized rendition of an advisory opinion by the bankruptcy court. This linchpin of the district court decision is itself quite questionable. As this court has previously observed, in following the *Hamilton* decision, "(t)his seems to recognize—if not the constitutional status of the bankruptcy court—at least its authority to render decisions in an exercise of the federal judicial power. For it is only constitutional courts which cannot render advisory opinions. 'A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A Moore's Federal Practice para. 57.12, p. 57–109, n. 2 (1983)." *Matter of Transport Clearings-Midwest, Inc.,* 41 B.R. 528 (Bkrtcy.W.D. Mo.1984). Accordingly, it has also been

previously noted that "it would seem that the bankruptcy court would have to make the determination in the first instance in order to come to the conclusion that there was no equity and ... no standing." *Matter of Rouse*, 54 B.R. 31, at 33 (Bkrtcy. W.D.Mo.1985). Thus, for the foregoing reasons, this court concludes that the issue of standing is also an arguable one and adumbrates sufficient doubt so as to prevent any award of attorney's fees against Mr. Jenkins on the grounds that he raised frivolous defenses.

For the foregoing separate and independent reasons, it is accordingly

ORDERED that the plaintiff's motion for reconsideration be, and it is hereby, denied.