In the Matter of GLOBAL INTERNA-
TIONAL AIRWAYS
CORPORATION, Debtor.

GLOBAL INTERNATIONAL AIRWAYS
CORPORATION, Plaintiff,

v.

LUCHTVARRTMAATSHAPPIJ TRAN-
SAVIA HOLLAND B.V., and Kilpatrick
and Cody, and Bank of the South, De-
fendants.

Bankruptcy No. 83–02765–2–3–11.
Adv. No. 85–0002–3–11.

United States Bankruptcy Court,
W.D. Missouri, W.D.

Dec. 30, 1986.

Howard D. Lay, Dysart, Taylor, Penner & Lay, K.C., Mo., for plaintiff.

Stephen R. Beckham, Kilpatrick & Cody, Atlanta, Ga., Robert R. Bartunek, Beckett & Steinkamp, Kansas City, Mo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT DIRECTING RETURN OF $50,000 PLUS APPROPRIATE INTEREST BY DEFENDANTS TO THE PLAINTIFF

DENNIS J. STEWART, Chief Judge.

This is an action brought by a chapter 11 debtor for the purpose of compelling the defendants to return to it the sum of $50,000 which the debtor paid as an earnest money deposit [1] on a contract for the lease

---

1. The material portion of the within complaint is to the effect that the plaintiff "transferred $50,000 to Kilpatrick and Cody as an earnest money deposit on a lease of a 737 aircraft to be returned unless Transavia submitted to (plaintiff) a lease in accordance with a letter of intent

of a certain airship which did not materialize.

The trial of this action has been conducted by the court and the parties were then, in the course of trial, granted an unlimited opportunity to adduce evidence on the issues joined by the pleadings. The facts which have been adumbrated by that evidence, as material, show that the debtor corporation initially entered into a simple agreement to lease certain aircraft from the defendant Luchtvaarmaatshappij Transavia Holland B.V. ("Transavia" hereinafter); that the agreement came into being when the defendant Transavia teletyped an offer to lease the aircraft to the plaintiff corporation[2]; that this teletype was dated October 9, 1984, or thereabouts, and provided for the lease of the aircraft on simple terms outlining the nature of the aircraft to be leased and the lease payments to be made over the duration of the lease[3]; that, on October 11, 1984, plaintiff's executive vice president, Robert I. Gale, sent a telex to the Kilpatrick and Cody law firm, which was acting as agent and attorneys for Transavia, and also to Transavia, requesting, on behalf of the plaintiff, certain immaterial changes in the existing letter of intent: delivery of the aircraft by November 6, 1984, initial monthly payment of $90,000 "in advance ... on the date of acceptance and delivery of the aircraft," certain additional terms respecting the supply of spare parts, and a letter of credit which plaintiff would obtain "from an acceptable U.S.A. bank in the amount of $150,000 from the date of acceptance and delivery";[4] and that these proposed modifications were accepted by Transavia by means of a reply telex also dated October

11, 1984. In that telex, it was further stated:

> "Kilpatrick and Cody has acknowledged receipt on behalf of (Transavia) and as attorneys for (Transavia) of 50,000 dlrs from Gl. (Transavia) will direct Kilpatrick and Cody to refund such funds, with any interest earned thereon, to Gl in the event that (Transavia) has not by October 19, 1984 presented to Gl for execution an aircraft lease agreement reflecting the terms and conditions of the October 9, 1984 telex mentioned above as hereby modified. It is understood that Kilpatrick and Cody is not acting as an escrow agent with respect to the 50,000 dlrs and that Kilpatrick and Cody shall be responsible only to (Transavia) with respect thereto and shall release such funds only as directed by Transavia."[5]

On October 12, 1984, Mr. Gale, on behalf of Global, telexed his agreement with the essential portions of this "proposed letter of intent."[6]

These letters and telexes formed the basis of the initial agreement made by the parties and on the basis of which the debtor made its earnest money payment of $50,000.[7]

By letter dated October 12, 1984, and subscribed by Allison Wade, the law firm of Kilpatrick and Cody transmitted a proposed lease agreement to Mr. Gale. The letter of transmittal of October 12, 1984, stated as follows:

> "Neither Mr. Taylor nor anyone else at Transavia has reviewed the enclosed draft Aircraft Lease Agreement. We know that significant changes in Articles 5 and 6 will be required.
>
> "In response to your recent telex, Mr. Taylor believes your concerns have been

---

as modified, between the parties, by October 19, 1984."

**2.** This telex, as material, contained no mention of insurance and provided that the debtor might obtain a letter of credit on a bank in the United States and contained no mention of a spare parts facility or a repainting responsibility when the leased aircraft should be returned to Transavia.

**3.** See note 2, *supra.*

**4.** Cf. note 8, *infra.*

**5.** There is nothing in the evidence to indicate that the material additional terms had been brought to the debtor's attention at this point.

**6.** See note 5, *supra.*

**7.** See note 5, *supra.*

answered by conversations between operating personnel of Global and Transavia."

The several particulars in which the proposed lease agreement added terms to those already agreed upon are set out in the marginal note.[8] As material, the new proposed provisions would obligate the debtor to obtain its $150,000 letter of credit on the Amsterdam branch of an American Bank which would be selected in the sole discretion of the defendant Transavia. According to the uncontradicted evidence adduced in the hearing of the action at bar, plaintiff did not have such a bank and had made it clear that it could only obtain a letter of credit from an American Bank as provided in the initial agreement between the parties. Further, the newly proposed lease agreement provided that, under certain circumstances, including any draws on the letter of credit, it had to be restored to $200,000. This, again, departed from the initial agreement between the parties. Significant differences were also proposed with respect to the providing of a facility for storage of spare parts, painting expense, insurance, and the number of remaining flight hours.[9] By letter dated October 22, 1984, to Mr. Wade and Mr. Taylor of the Kilpatrick and Cody law firm, Mansour Rasnavad, the chief executive officer of the debtor corporation, stated as follows:

> "The lease revision has a number of significant and material departures from the Letter of Intent, as modified. It is even more of a departure from our last meeting with Messrs. Taylor, Aalst and Pietersen on October 17, 1984. Without specifying each departure from the Let-

ter of Intent, the lease imposes new obligations on Global for storage and spare parts costs; requires a revolving letter of credit in the full original amount; requires a final order of the Bankruptcy Court; fails to limit Global liability to 100 thousand dollars as agreed with Mr. Taylor; and other material changes.

> "Since (Transavia) did not present Global with an aircraft lease agreement reflecting the terms and conditions of the Letter of Intent, as modified and agreed upon on October 19, 1984, you are directed to refund our deposit of fifty thousand US dollars ($50,000) by wire transfer to Global account number 022160 at the Kansas American Bank; 9900 West 87th Street; Overland Park, Kansas."

The defendants, however, declined to refund the earnest money deposit. And there is no evidence that they reinstituted their offer to abide by the initial agreement between the parties and abandon the additional terms contained in the proposed lease agreement. Needless to say, the aircraft in question was never delivered to the plaintiff.

### Bankruptcy Court Jurisdiction

The most vexatious question which arises out of the foregoing facts and contentions is that of bankruptcy court jurisdiction. It is this significant question which has given this court considerable pause in issuing this decision. The Bankruptcy Amendments and Federal Judgeship Act of 1984 applies to this adversary action.[10] Under its provisions, this court is required *sua sponte* to raise and consider

---

**8.** There were also other additional terms, including the following: Transavia insisted on a final order of the bankruptcy court as a prerequisite to delivery of the aircraft, a new precondition which debtor's officers testified would significantly increase the costs and attorney's fees involved. Another new requirement which involved significant additional cost was that Global should "provide a store appropriate for keeping all the Spare Parts and other items provided by (Transavia)." A new repainting of $3,000 was to be imposed on the debtor for replacing Transavia's colors and livery on the aircraft upon its redelivery to Transavia at the end of the lease. Fully 700 fewer remaining flight

hours were to be provided than the number which the debtor required. And liability insurance $150,000 higher than that carried by Global and insurance of $8 million coverage on the hull was also now to be required, whereas the original agreement was silent on the subject of insurance.

**9.** See note 8, *supra.*

**10.** The jurisdictional provisions of that Act apply in all cases and actions arising therein pending on or filed after July 10, 1984.

the issue of its own jurisdiction. See section 157(b)(3), Title 28, United States Code, to the following effect:

"The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."

In analyzing this action under the governing jurisdictional principles, it has first to be observed that this is an action based on plaintiff's allegations of defendants' breach of contract.[11] And it was plainly held by the Supreme Court of the United States in the landmark case of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), that actions sounding in contract and for breach of contract are plainly without the jurisdiction of the bankruptcy court. The Congress of the United States, in enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, has interpreted the rule of the *Marathon* decision, *supra*, to provide that the bankruptcy court may hear an action which arises exclusively under nonbankruptcy law and make recommended findings of fact and

conclusions of law to the district court as provided in section 157(c)(1), Title 28, United States Code. This court, nevertheless, has not ordinarily followed the practice of making recommended findings of fact and conclusions of law to the district court because of the omnipresent possibility that such an activity may be rendered futile and useless by later abstention of the district court under section 1334(c)(1) or section 1334(c)(2), Title 28, United States Code.[12] When such a possibility exists, this court has found it a preferable course of action to render the decision itself. Then, on appeal, if the district court finds the bankruptcy court to have been without jurisdiction, it still has the option to treat the bankruptcy court's findings of fact and conclusions of law as recommended findings and conclusions and to render its own decision on the basis of them.[13] Thus, it seems to serve a substantial economy of time and effort for the bankruptcy court to find—when it is honestly possible to do so—that it has jurisdiction, and, if at all possible, render the decision itself.

In making a finding of bankruptcy court jurisdiction, however, "the higher courts (must) be circumscript in delegating powers to the bankruptcy court lest they by indirection confer Article III powers on the bankruptcy court (and) the bankruptcy court must be circumscript in interpreting

---

**11.** It is alleged that the contract was breached in at least two particulars: (1) in repudiating the lease agreement by offering to perform only on additional material terms and (2) in refusing to return the earnest money payment in accordance with the initial contractual provision quoted on page 2 of the text hereof.

**12.** The mandatory abstention statute, section 1334(c)(2), Title 28, United States Code, technically speaking, does not apply in actions in this case because it was filed before July 10, 1984. See section 122 of P.L. 98–353 to the pertinent effect that "Section 1334(c)(2) ... shall not apply with respect to cases under title 11 of the United States Code that are pending on the date of enactment of the Act, or to proceedings arising in or related to such cases." The permissive abstention statute, section 1334(c)(1), Title 28, United States Code, applies, however, and it is difficult to believe that, in passing on the question of permissive abstention, the district court would not be swayed by the letter of section

1334(c)(2), *supra*, in deciding whether it might not be an abuse of discretion not to abstain.

**13.** See *In re Waters*, 93 F.2d 196, 198 (5th Cir. 1937), to the following effect: "We think that the referee went too far in attempting to decree a cancellation of the mortgage summarily; but, since the evidence was all reported stenographically and went up to the judge along with the documentary proof and was fully considered by the judge, who made his own decree, the case has just had the treatment it would have had if a plenary bill had been filed, been reported on by a master, and then considered by the court. The referee made full findings of fact and conclusions of law, as a master would do, and the appellant elaborately excepted to them as if to a master's report. We will treat the case as a controversy arising in bankruptcy by intervention and decided by the judge, review of which on appeal as in equity opens up questions of law and fact."

the law delegating powers to it lest it be accused of arrogating Article III powers to itself." *Matter of Richardson,* 52 B.R. 527, 533 (Bkrtcy.W.D.Mo.1985). This is so because "it has in the past been held that a court initially created as a non-Article III court may 'mature' into an Article III court by reason of being assigned a portion of the federal judicial power." *Id.* at 534; *Glidden Co. v. Zdanok,* 370 U.S. 530, 538, 540, 541, 82 S.Ct. 1459, 1466, 1467, 1468, 8 L.Ed.2d 671 (1962) ("If it were plain that these judges were invested upon confirmation with Article III tenure and compensation, it would be necessary for present purposes to consider the constitutional status of (the courts on which they sit) ... (T)he constitutional quality of tenure and compensation ... depend(s) upon the constitutional status of the courts to which they were primarily appointed."); *Kalaris v. Donovan,* 697 F.2d 376, 385 (D.C.Cir.1983) ("(I)t is not what Congress says but what powers Congress vests in the adjudicatory body that counts.") "And if a court does mature in such a manner, it is clear that its judges become Article III judges, without the necessity of reappointment, regardless of the character of their initial appointment." *Matter of Richardson, supra,* at 534.

▇ Under such circumstances, "(t)he bankruptcy courts ... have an interest equal to that of the district court in preventing Article III status from being conferred by accident and without a rational and direct decision by the appropriate branch of Government." *Matter of Golden Gulf, Ltd.,* Adversary Action No. 86–0147 (Bkrtcy.E.D.Ark. Oct. 14, 1986). In searching for a lawful and inoffensive basis for bankruptcy court jurisdiction, it must initially be observed that traditionally it has been considered within the bankruptcy court's "summary" jurisdiction to enforce a contract which has been entered into by a trustee or debtor-in-possession.[14] The rule of the *Marathon* decision, *supra,* does not appear to contain the same concession to summary jurisdiction over the subject matter of postpetition contracts. Its rule, rather, appears to cut broadly across the gamut of civil actions which are related to bankruptcy administration, regardless of whether they have their genesis in postpetition occurrences. Nevertheless, it must be noted that litigants who find themselves in a position adverse to that of a trustee or debtor-in-possession by reason of their postpetition contracts with such entities can have little basis for opposing the exercise of bankruptcy court jurisdiction over them when they have knowingly transacted business with an entity in title 11 proceedings. This court therefore fastens its jurisdictional basis in this case on that historical concept. Otherwise, it can only be observed, as this court recently stated in *Matter of First United Partners 9,* 71 B.R. 233 (Bkrtcy.W.D.Mo.1986), as follows:

"(T)he decisions which have been rendered in the wake of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] (1982), have not clearly demonstrated the boundaries of non-Article III power. They have, in signal departure from prior constitutional authority, indicated that a bankruptcy court may occasionally exercise Article III powers. See, e.g., *In re Johnson County Gas Co.,* Inc., 30 B.R. 690, 701 (Bkrtcy.E.D.Ky.1983), to the effect that, 'where necessary and justified by an exigency a non-Article III judge may exercise the judicial power of the United States for a transitory period.' This holding was in contrast to prior decisions on the subject, which reserved the 'exigency' provisions for territories and nascent states where there were no other courts except non-Article III courts to exercise the federal judicial power.

---

**14.** "The jurisdiction of the court to act summarily in such a matter is the same as that of a court of equity in any judicial sale. It is based upon the view that the purchaser (or other contracting party) makes himself a party to the proceedings and undertakes to do a particular act under the order of the court." 4B Collier on Bankruptcy para. 70.98, pp. 1203, 1204 (14th ed. 1978).

But it has nevertheless seemed to have commenced a trend in decisional law which has continued to the present day, under which, as this court recently observed, the line between Article III and non-Article III powers 'daily grows more blurry.' *Matter of Brewer*, [65 B.R. 75] Adversary Action No. 86–0193–SW–11 (Bkrtcy.W.D.Mo. August 8, 1986). When reference of the action to the district court for decision would defeat the federal jurisdiction which must be exercised if the goals of the bankruptcy statutes are to be maintained, the bankruptcy court may exercise jurisdiction, even if it means exercising Article III powers in an isolated case. *Matter of Burstein-Applebee Company*, 63 B.R. 1011 (Bkrtcy. W.D.Mo.1986); *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528, 539 (Bkrtcy.W.D.Mo.1984). And see *Matter of Phillips House, Inc.*, 64 B.R. 912 (Bkrtcy.W.D.Mo.1986), to the effect that '(w)hatever the rationale for this court's assuming and exercising jurisdiction of this case ... it is imperative that this court proceed to a determination of it.' "

### Conclusions of Law

■ The above found facts are to the effect that the $50,000 earnest money deposit was paid to the defendants in reliance upon an initial agreement between the parties before the defendant Transavia imposed additional requirements. Several of these additional requirements were material. It could hardly be regarded as so much as arguable that the new requirement that a letter of credit be obtained which Transavia could accept or reject in its sole discretion was a material one. The evidence clearly shows that it was imposed on or about October 19, 1984, after the earnest money deposit of $50,000 was made by the plaintiff on October 11, 1984. This requirement was made even more onerous by the requirement, also added on or about the date of October 19, 1984, with the transmission of the proposed lease draft, that the letter of credit be on an Amsterdam bank, when Global could only reasonably be expected, according to the uncontradicted testimony in the hearing of the merits of this action, to obtain a letter of credit from a bank in the United States. Further, many other requirements were superimposed as prerequisites to delivery of the aircraft.[15] The other additional terms urged by the defendant Transavia, although in themselves less material than the new letter of credit requirement, nevertheless, considered in combination, they leave little doubt as to the materiality of the constellation of additional terms insisted upon after the earnest money deposit had already been made.

■■ The law clearly recognizes the principle that for a contracting party to insist on additional material preconditions to its performance is for it to breach the original contract by repudiation.[16] On the occurrence of such a breach, the other contracting party is entitled to its damages, including the expenses which it incurred in undertaking and commencing its own performance of the contract.[17] The only relief requested by the debtor corporation is the return of its $50,000 deposit. There can be no question, on the basis of the foregoing facts and principles, that the debtor is entitled to the relief requested.

The limitation of the relief to the return of the earnest money deposit also keeps this action more likely within the strictures

---

**15.** See note 8, *supra.*

**16.** "Nearly all the courts considering the question have reached the conclusion that a renunciation or repudiation of a contract before the time for performance, which amounts to a refusal to perform it at any time, gives the adverse party the option to treat the entire contract as broken and to sue immediately for damages as for a total breach." 17 Am.Jur.2d *Contracts* section 449, p. 912 (1964). "To constitute an

anticipatory breach based on a request for a modification of terms, such request must be coupled with an absolute refusal to perform unless the request is granted." *Id.*, section 450, p. 914. The circumstances of the action at bar leave no doubt that the defendants insisted on the additional material terms as a precondition of their performing the contract.

**17.** See note 16, *supra.*

of bankruptcy court jurisdiction. If the joined issues required a judicial determination of unliquidated damages, the rule of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., supra,* for the reasons stated above, almost certainly would take this action out of the ambit of the jurisdiction of a non-Article III court. But the summary processes of bankruptcy court jurisdiction have been held to be available when no more was required than the return of a security deposit or other type of deposit.[18] Even more generally, when the relief requested is only payment according to a clear contract right involving no material issue of fact, the current law recognizes the propriety of bankruptcy court jurisdiction. See section 542(b) of the Bankruptcy Code; *Matter of Kakolewski,* 29 B.R. 572 (Bkrtcy.W.D.Mo.1983).

The defendant states, in a posttrial letter brief addressed to the court, that it is the "position of the defendants in this proceeding that Global's refusal to sign the aircraft lease submitted to it by Transavia because Global had no use for the aircraft ... since the Capitol deal (under which Transavia was to provide services for payments nearly equal to its payments to Transavia under the prospective lease) fell through." It is a fundamental principle of contract law, however, that a party's motives with respect to a contract are not controlling. It is the objectively manifested intent of the parties which controls the material issue. And, as recounted above, the evidence in this action shows without contradiction that the parties initially materially agreed on material terms which were exclusive of the material complex of terms later sought to be added by Transavia. Thus, no material legal or factual issue has been or can be made by this assertion. ■ The same is true of the other posttrial contention of the defendants. They contend that the material additions "were contained in *the initial draft of the lease*

sent to Global for its review a week prior to the transmission of the lease of which Global complaints, and yet no objections were then raised." (Emphasis in original.) The critical issue of timing, however, is whether the $50,000 earnest money deposit was made prior to the urging by Transavia of the additional terms. The evidence, as found above, is that the payment of the $50,000 was made before Transavia made known its insistence on the additional material terms.

It is therefore

ORDERED, ADJUDGED AND DECREED that the defendants, within 30 days of the date of filing of this order or within such additional time as the court may grant for good cause timely shown in writing within the same 30 days, return the $50,000 to the plaintiff plus interest at 9% per annum from the date of the filing of the within complaint for relief.

---

**18.** This is particularly so under the explicit provisions of section 542(b) which are to the pertinent effect that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee (or debtor-in-possession) except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.