**In re MERCURY LAMPS, INC., Debtor.**

**Bankruptcy No. 088–80508–21.**

United States Bankruptcy Court,
E.D. New York.

Dec. 22, 1989.

Shaw, Licitra, Eisenberg, Esernio & Schwartz, P.C. by Herbert J. Tamres and Sarah M. Keenan, Garden City, N.Y., for debtor.

Siegel, Sommers & Schwartz by James A. Beldner, New York City, for Creditors Committee.

Parker, Chapin, Flattau & Klimpl by Joel Lewittes and Joel M. Shafferman, New York City, for Hy Art Industries.

**OPINION**

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court is an application by Hy Art Industries, Inc. ("Hy Art") for an order directing the Official Committee of Unsecured Creditors (the "Creditors Committee") of the debtor, Mercury Lamps, Inc. ("Mercury" or "debtor") to return to Hy Art a check in the amount of $50,000, plus earned interest, surrendered as evidence of good faith in connection with an offer to buy the debtor's assets which proved unsuccessful. The debtor and its creditors are resisting the application on the ground that Mercury was ready, willing and able to close on October 20, 1988 and the failure to close was due to Hy Art's default. (Objection to Application of Hy Art for Order Directing Release of Escrow, p. 11).

### THE FACTS

Hy Art has been engaged in the business of manufacturing lighting products, including portable lamps and permanently installed lighting fixtures (Tr. 21).[1] Richard Spath, who has been connected with Hy Art since May 9, 1972 is its chief executive officer in charge of overall operation and planning (Tr. 21). His son, Gregg Spath, and John Giordina are vice presidents. (Tr. 21–22). The attorney representing Hy Art in the events relevant to the present application were Stephen B. Delman, a partner in Parker, Chapin, Flattau & Klimpl ("Parker, Chapin"), and Joseph A. Caccamo, an associate employed by that firm.

Mercury, which is also in the business of manufacturing lighting products, filed a petition for relief under Chapter 11 of Title 11 of the United States Code on June 3, 1988. Irwin Ruth is the President of Mercury and the owner of 50 percent of its stock. (Tr. 23). Charles Adams owns the other 50 percent and is Vice–President. The attorneys principally involved in representing Mercury in the events here involved were Herbert J. Tamres and Sarah M. Keenan,

---

1. "Tr." refers to the transcript of the hearing held in connection with the Application on January 11, 1989 before this Court. "Tr. II" indicates the transcript of the hearing held on March 22, 1989.

all then partners in Shaw, Licitra, Esernio & Schwartz ("Shaw, Licitra"). Charles Adams was represented by Robert Pryor.

The Creditors Committee was represented by James A. Beldner, Esq., of the firm of Segal, Summers & Schwartz.

IFTI Factoring Corporation ("IFTI"), while not a party to the present application, was a key participant. It was represented by Jane Myer at the recommendation of Shaw, Licitra, which deemed itself disqualified from representing IFTI. (Tr. 189, 190). Mr. Angelan is an officer of IFTI.

### Hy Art's Offer

On the same day as Mercury voluntarily filed under Chapter 11, it applied for leave to borrow money from IFTI to which it had no previous indebtedness. On June 21, 1988, Bankruptcy Judge Hall signed an order authorizing Mercury to grant IFTI, in exchange for money to be loaned, a continuing security interest in all of Mercury's existing or thereafter acquired accounts receivable, inventory and contract rights.

IFTI also extracted from Mercury's two stockholders, Irwin Ruth and Charles Adams, their personal guaranty of the corporate indebtedness backed up by their personally owned collateral. (Tr. 57).

Shortly thereafter, as the result of a bidding war, precipitated when Adams made known to Mercury's creditors that a company interested in engaging his services was ready to buy Mercury's assets, Hy Art made a counter offer which Mercury's Creditors Committee decided to accept. Under Hy Art's offer, Ruth was to become an employee of Hy Art. (Tr. 62, 63).

### The August 23, 1988 Offer

The present dispute has its source in the ambiguity of certain key documents and in the discrepancy between what Mercury had the ability to convey and what it promised to convey when it accepted Hy Art's offer. What Hy Art proposed to purchase was all of Mercury's assets free and clear of all liens and encumbrances. The sole exception was the security interest of IFTI in Mercury's accounts receivable. The critical language of the offer read:

1. All of your inventory (including, without limitation, raw materials, parts, work-in process, finished goods and supplies), all of your accounts receivable (subject to the existing security interests (if any) of IFTI Factoring Corp. ("IFTI") or Rosenthal & Rosenthal, Inc. ("Rosenthal")), all sums due and owing, or which may become due and owing, to you from IFTI and Rosenthal, all of your furniture, fixtures, machinery and equipment.

(August 23, 1988 Letter Agreement, p. 1) ("Letter Agreement")

In fact, IFTI had a security interest in Mercury's inventory as well as Mercury's accounts receivable. But the offer did not except that security interest.

Hy Art proposed to make the following payments for Mercury's assets:

(i) an amount, not exceeding $135,000, necessary to pay substantially all of Mercury's scheduled unsecured creditors twenty-eight percent of the amount of their allowed claims;

(ii) an amount, not in excess of $5,000, to pay outstanding New York City Franchise taxes;

(iii) an amount, not in excess of $30,000, to pay the fees of certain professionals retained in Mercury's Chapter 11 case;

(iv) an undetermined amount necessary to cure existing defaults in the payment of rent under certain leases for Mercury's factory premises located in North Lindenhurst, New York and showroom premises located at 230 Fifth Avenue, New York, New York and the Southern Furniture Market Center located in High Point, North Carolina; and

(v) an undetermined amount necessary to pay post-petition administrative expenses incurred by Mercury in the ordinary course of its business and any Court charges or administration expenses which remain unpaid as of the closing.

(Letter Agreement, pp. 1, 2).

Hy Art's proposal further provided that within 60 days following the closing Hy Art would take such action as might be necessary to cause IFTI to release to Irwin Ruth

and Charles Adams, Mercury's two shareholders, the securities pledged by them to IFTI as collateral for their personal guaranties. (Letter Agreement, p. 3). As the proposal noted, Hy Art expected to retain Ruth as an employee and have him assume exclusive managerial control of Mercury upon the acceptance of Hy Art's offer. (Letter Agreement, p. 2).

Paragraph 4, pages 2, 3, of the Proposal set forth the following conditions to be met by Mercury:

(a) the obtaining from the landlords under the Leases of consent to the assignments of the Leases contemplated hereby;

(b) approval by the Court of the transactions contemplated hereby in a final non-appealable order;

(c) the current catalog inventory included in the Assets having a value on your books, as of the Closing, of not less than $250,000; and

(d) the execution and delivery to Hy Art, at the Closing, of bills of sale and other assignment instruments (in form reasonably satisfactory to Hy Art's counsel) containing appropriate representations regarding title to the Assets, free and clear of all liens, claims, charges and encumbrances, and covenants of further assurances on your part, which bills of sale and other assignment instruments shall be sufficient to enable Hy Art to obtain the benefits contemplated by this proposal.

Following the recital of the conditions to be met the proposal dealt with the subject matter of the present application. Described as accompanying the proposal was a check in the amount of $50,000 (the "Deposit"), payable to Max Goldhaber, Esq., Secretary to the Creditors Committee. The August 23, 1988 Letter provided that Mr. Goldhaber was to hold the Deposit in escrow in a segregated interest-bearing account for the account of Hy Art to be returned if Hy Art's proposal was not accepted by August 24, 1988. (Letter Agreement, p. 3). The next paragraph covered the return of the Deposit. It read:

If this proposal is accepted by you and the conditions hereto have not been satisfied, or the Closing shall not have taken place, by September 14, 1988, this proposal and your acceptance thereof shall be deemed withdrawn without any further liability on the part of you or Hy Art, whereupon this proposal shall terminate and be of no further force or effect and the Deposit, with any interest accrued thereon, shall be returned to Hy Art.

Hy Art's proposal called for acceptance by August 23, 1988 and a closing by September 7, 1988. (Letter Agreement, pp. 1, 2). Hy Art wanted to purchase the assets of Mercury's business as soon as possible because of concern that Mercury's goodwill would deteriorate. (Tr. 65).

On August 25, 1988 Mercury's counsel submitted to the Court *ex parte* an order shortening, from twenty days to seven, the notice required by Bankruptcy Rule 2002(a) for a sale of property other than the ordinary course of business. The Court refused to shorten the time because what the debtor was doing was disposing of all its assets although no plan of reorganization had been filed. The Court noted that the debtor's request was predicated on a two-page document which provided no facts from which anyone could judge whether or not this sale represented a satisfactory price for the assets. (Memorandum Decision, August 26, 1988, pp. 1, 3, 4).

Mercury then sent out a "Notice of Hearing to Consider Offer to Purchase Property" ("Notice") supported by (1) an "Application to Sell Assets" ("Application") signed by a Shaw, Licitra partner, (2) a copy of the Hy Art offer and (3) a liquidation analysis. These documents perpetuated the confusion respecting what Mercury was selling and what Hy Art was proposing to buy.

As already noted, Hy Art's proposal was to buy the inventory, but not the accounts receivable, free and clear of all liens. The "Notice" to creditors described the property as "being sold subject to the existing security interest of IFTI Factoring Corp." and said that Hy Art would take title, "free

and clear of any and all liens, claims and encumbrances (with the exception of the security interest held by IFTI Factoring Corp.)." The Notice did not describe IFTI's liens. However, the documents which accompanied the Notice, that is, the Application, Hy Art's offer itself and the liquidation analysis, described only Mercury's accounts receivable as burdened by the IFTI lien; no reference was made to the lien as also being on inventory. In describing the secured debt, the Application read:

> The Debtor's post-petition factor, IFTI Factoring Corporation, is presently due approximately $121,000 secured by receivables with a face value of $159,000. Until IFTI is paid in full, no value can be attributed to the accounts receivables [sic] available for creditors.

By contrast, the discussion in the Application of the debtor's inventory made no reference to IFTI's lien.

Similarly, the liquidation analysis showed the accounts receivable as subject to IFTI's lien, but not the inventory. The entry for accounts receivable read, "a/c Receivable net of factors encumbrance;" the entry for inventory read simply "Merchandise inventory."

At the hearing on September 20, 1988 on the proposed sale it was represented to the Court that immediate sale was necessary because the assets were deteriorating and goodwill would evaporate unless the transfer took place promptly. The Court, therefore, deemed the requirements of *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983) satisfied and approved the sale.

The Court subsequently entered an order dated September 22, 1988, authorizing a sale of Mercury's assets under the terms contained in Hy Art's proposal, which as already noted, called for the purchase of Mercury's assets free and clear of all liens except a lien held by IFTI on Mercury's accounts receivable.

The Court's approval was conditioned on the debtor's commitment to file a plan and disclosure statement no later than November 30, 1988. The Order further provided that the purchase price and the assumption of the obligations referred to in Hy Art's proposal were to be paid, or assumed, at a closing to be held no later than September 27, 1988. Up to that date Hy Art was committed to pay all post-petition expenses incurred in the ordinary course of business.

### The Delay in Closing

Although the Order of the Court called for closing no later than September 27, 1988, no closing took place on that date and no application was made to the Court to delay the closing.

As a condition precedent to the closing it was required that Mercury's current catalogue inventory have a value on its books of not less than $250,000 (Letter Agreement, pp. 2, 3), based on the lower of cost or market value. (Tr. 94).

Mercury first made its inventory available for inspection on September 26th and it was inspected on September 30th by representatives of Hy Art. (Tr. 21). On that date Richard Spath, his son Gregg Spath, and John Giordina, both Vice Presidents of Hy Art, went to Mercury's premises to inspect Mercury's inventory. (Tr. 21, 22). They were there approximately four hours, of which about three hours were spent in inspecting the inventory. (Tr. 28–30). They inspected approximately 50 to 70 boxes located in different areas and containing various kinds of inventory. They opened the boxes and looked for defects. They also examined raw material on the premises. (Tr. 28–30). They found half the inventory to be on the floor, partially assembled, gathering dust and dirt. A pile of rusted steel tubing, listed at full cost on the inventory given them, was not worth scrap value. The inventory, to which Mercury had attributed a value of $65,000, was composed of cast white metal parts of which 90 percent were defective. (Tr. 28–30).

In the expert opinion of Richard Spath, the inventory, as of that date, had a value of less than $200,000. (Tr. 30).

Mercury conducted no business after September 30, 1988 and there were no shipments after that date except of some com-

pleted items not included in the inventory given Hy Art. (Tr. 31).

On October 20, 1988 Mercury's inventory had no higher value than it had had on September 30, 1988, a value substantially less than $250,000. (Tr. 30).

Despite Spath's dissatisfaction with the inventory Spath did not attempt to renegotiate the price because he was advised that any reduction in the price would require the approval of the Bankruptcy Court which would involve further delay. (Tr. 130, 131). He also continued to try to effect the purchase. (Tr. 26, 27).

However, he refused to execute a written extension of the closing date as requested by Mercury's counsel. (Tr. 26, 66; Tr. II 20). Mr. Delman so advised Mercury's counsel and also told her that it was Hy Art's position that it had no obligation to proceed. (Tr. II 21) Nevertheless, a new closing date of October 20, 1988 was agreed upon. (Tr. 26, 27).

*The Assignment of Mercury's Leases*

A condition precedent to the closing on Hy Art's offer was obtaining consents from the landlords to the assignments of Mercury's leases for premises located in North Lindenhurst, New York, New York, New York and High Point, North Carolina. (Letter Agreement, pp. 2, 3). Hy Art had agreed to pay for curing existing defaults. (Letter Agreement, p. 2).

Mercury took no responsibility for arranging the necessary consents, limiting themselves to determining the amount of the rental arrears owed to each landlord. (Tr. 198). Caccamo, Hy Art's counsel, was told that Hy Art should conduct the negotiations with the landlords. (Tr. II, 27). While these negotiations were proceeding Mercury arranged for, and submitted to, the Bankruptcy Court the formal documents needed to extend Mercury's time to assume or reject these leases. (Tr. 198).

On October 19, 1988, the day before the new closing date of October 20th, the attorney for the New York landlord told Hy Art's counsel that the consent of that landlord would only be forthcoming if Hy Art paid an additional $2,500 in legal fees to cover the cost incurred by the landlord for preparing to evict Mercury. (Tr. II, 32). The same evening Mercury's North Carolina landlord advised Hy Art that its consent to the assignment depended upon the payment of certain pre-petition cooperative advertising expenses owed by Mercury. (Tr. 75, 76). Only after Richard Spath agreed to meet these additional demands did the landlords verbally agree to make available their consents to the assignment of the leases. (Tr. II, 32). They agreed with Ms. Keenan that upon receipt of facsimile copies of checks payable to them and of the assignments to be executed, executed assignments would be returned by overnight mail. (Tr. 199).

Payment of legal fees to Mercury's New York landlord formed no part of Hy Art's original offer. Hy Art had only agreed to pay rental arrears. (Letter Agreement, p. 2). Whether or not cooperative advertising expenses constituted rent under the lease is not clear from the record.

Whatever oral promises the landlords had given Mercury's counsel their written consents to the assignment of Mercury's leases to Hy Art were not in the possession of Mercury's counsel on October 20, 1988. (Tr. II, 32).

*The Asset Purchase Agreement*

Mercury's counsel prepared the first draft of the Asset Purchase Agreement on September 6, 1988. The draft was unacceptable to Hy Art's counsel because it omitted various warranties which they deemed to be necessary. (Tr. II, 6). The exchange of drafts that ensued appears to have been unnecessarily lengthy, protracted and time consuming for a variety of reasons. Mr. Tamres did not make use of the customary methods such as redlining by which exchange and review of lengthy documents is customarily expedited. (Tr. II, 13). Furthermore, Mr. Tamres kept insisting on language which provided that the transaction would be subject to "immaterial liens arising by operation of law" even though he was unable to explain to Mr. Caccamo what an "immaterial lien aris-

ing by operation of law" was nor its relevance. (Tr. II, 12). In addition, various changes in the draft agreements were necessary because (1) Hy Art at one time contemplated purchase by subsidiary and then reverted to a direct purchase (Tr. II, 15); (2) the documents designated Richard Spath as President of Hy Art and not until October 20, 1988 did Mercury learn that he was to be identified as "Vice President," requiring an amendment to the notice (Tr. II, 15); (3) Parker, Chapin was unable to issue an opinion letter in the form requested by Shaw, Licitra because they were not corporate counsel requiring the revision of Shaw, Licitra's letter (Tr. II, 16).

Despite these problems, by October 18, 1988, the Asset Purchase Agreement and all exhibits were in a form satisfactory to both parties and although various changes, some in handwriting, were made on October 20, 1988, by the end of that day the agreement was ready to sign had other problems not developed. (Tr. 181, 182).

### The October 20, 1988 Closing

Richard Spath came to the closing on October 20, 1988 prepared to close despite the deficiencies in the inventory and the demands of the landlords. (Tr. 33). He brought with him a cashier's check in the amount of $115,000 payable to Mercury and checks drawn to the order of each of the three landlords. (Tr. 33). Neither then nor at any other time did Hy Art ever advise Mercury that it was in default. (Tr. 112, 113).

### IFTI's Lien

It was essential to Hy Art that Mercury's inventory be released from IFTI's lien otherwise the inventory was unusable. Exactly when Hy Art learned that IFTI's lien extended to Mercury's inventory as well as to Mercury's accounts receivable is not disclosed by the record. In any event, sometime after the Court approved the sale IFTI informed Hy Art that it would not release its lien on Mercury's inventory without further collateral. What IFTI demanded, and Hy Art agreed to give, was a guaranty up to $25,000 of the moneys advanced by IFTI

(Tr. 75) and a standby letter of credit in the amount of $34,592.12 to the benefit of IFTI. (Tr. 80; Exhibit B to Affidavit of Jane Myers). Hy Art's guaranty was only to be resorted to after IFTI had collected Mercury's accounts receivable and the fair market value of the collateral belonging to Ruth and Adams. IFTI, as a further condition to consenting to the release of its lien on inventory, demanded that Hy Art pay IFTI its legal expenses of $1,000. (Exhibit B to Affidavit of Jane Myers; Tr. 39, 79). Prior to October 20th Richard Spath had agreed to these conditions and they were incorporated in a draft agreement.

However, new complications were introduced by Mr. Adams, Mercury's 50 percent stockholder, when on October 19, 1988, the night before the scheduled closing, he met with Ms. Keenan at Shaw, Licitra. As Mercury and its counsel were aware, Hy Art was unwilling to consummate the deal unless the consent of Mercury's stockholders to the sale was forthcoming. (Tr. 82, 83). Adams gave Keenan his consent stipulating however that it be held in escrow and not be turned over to Hy Art until Adams received a check then being held by IFTI, representing the proceeds of the stock given IFTI as collateral to back up Adams' guaranty of Mercury's debts. (Tr. II, 24). While Adams made the delivery of the check to him a condition of his consent, it was IFTI's position that the check itself was worthless as collateral because it was made out to Adams. (Tr. 88, 89).

Precisely how it was proposed to work out this problem is unclear because none of those present, including all the attorneys involved, are clear even today as to the terms of the attempted resolution. What does seem to be clear is that Hy Art was asked to increase its potential exposure to IFTI by $24,000, the amount of Adams' check. It is unclear, and no one appears to know even now, what precisely Hy Art was asked to do, that is, whether it was to deliver a note to IFTI in the amount of Adams' check thereby substituting its note for Adams' collateral (Tr. 37) or to deliver a note to Adams in return for which Adams

would endorse the check held by IFTI. (Tr. 89).

Resolution of the problem created by Adams was complicated by the fact that Adams, after leaving his consent as a stockholder to the sale in escrow with Ms. Keenan, left for a furniture show in North Carolina and was not available to be consulted. (Tr. 83, 90). Ms. Keenan disclaimed his representation because although he had left the critical documents with her, his nominal attorney was Robert Pryor. (Tr. 83).

All day long Hy Art's counsel, Mr. Delman, and Shaw, Licitra's counsel, Ms. Keenan, spent hours on the telephone with Mr. Pryor attempting to persuade him to agree to some arrangement which would permit the release of the consent being held in escrow. (Tr. 89, 90). During these telephone conversations Mr. Pryor took the position that he had no authority to bind Adams and therefore was not in a position to do anything. (Tr. 90). Ultimately Mr. Pryor orally agreed to an arrangement of some character but what that arrangement was nobody apparently knew either on October 20, 1988 or at the hearing on January 11, 1989. (Tr. 89, 90).

Delman, who had conducted the negotiations with Pryor, was asked respecting them. The following colloquy began with an inquiry from the Court:

THE COURT: I still want to know if there was any ultimate disposition of the problem with Mr. Adams. Did Mr. Adams agree to anything ultimately?

THE WITNESS: I believe we ultimately persuaded Mr. Pryor to go along with some arrangement. I don't recall the exact nature of that arrangement.

THE COURT: You don't remember the arrangement? Mr. Pryor agreed to some arrangement?

THE WITNESS: I believe he did.

THE COURT: Did he condition that with saying he had no authority to agree to that arrangement, or did he decide—

THE WITNESS: I think he was willing to go along. I think, frankly, I think Miss Keenan and I both exerted a fair amount of pressure on him and pointed

out to him that this transaction would certainly fall apart and be incapable of being consummated if he were not willing to go along.

THE COURT: Did Mrs. Keenan at that point release the documents she was holding for Mr. Adams?

THE WITNESS: The documents were never, in fact, released because the closing never took place.

(Tr. 90, 91).

Mr. Adams' insistence on the immediate release of the collateral he had given IFTI was inconsistent with Hy Art's offer to buy Mercury's assets under which Hy Art was to have 60 days after the closing to "take such action as may be necessary to cause IFTI to release to Irwin Ruth and Charles Adams the securities pledged by them to IFTI as collateral for a letter of credit issued by IFTI for your [Mercury's] account." (Letter Agreement, p. 3).

In addition, although page 2 of the Letter Agreement called for Ruth to assume exclusive managerial control of the business, Hy Art learned shortly before October 20th that Adams and his son were being paid $3,750 per week in salaries, constituting administrative expenses for which Hy Art was responsible. (Tr. 76).

Capping the confusion was a demand late in the day by IFTI's attorney for $2,100 in legal fees instead of the $1,000 to which Hy Art had agreed. (Tr. 39, 77, 179, 202). Ms. Keenan and Mr. Tamres of Shaw, Licitra, both sought to persuade Hy Art to pay the additional fees requested by IFTI's attorney, Jane Myers. (Tr. 179, 202). Ms. Keenan urged that IFTI's work had been done on behalf of Hy Art. (Tr. 202). Only after Mr. Spath made it clear that this was one additional expense that he was not going to accept did Hy Art's Counsel, Mr. Tamres state "it's really a non-issue, the debtor will absorb the $1,100." (Tr. 180).

This demand coming at the end of a long day of negotiating, lasting more than eight hours, during which nothing to eat or drink had been offered the participants and from which Mr. Tamres, the debtor's most knowledgeable attorney, had absented him-

self during a large part of the proceedings (Tr. II, 29, 30), proved too much for the exhausted Mr. Spath. He left saying he would return a few days later to sign the necessary documents and he instructed Mr. Ruth to take orders at the North Carolina furniture show to be filled by Hy Art after it acquired Mercury's assets. (Tr. 152). However, when Ruth telephoned Spath on October 23rd Spath told him that the deal was off. (Tr. 152). The following day Mr. Tamres requested of Spath on the telephone that the negotiations be resurrected. (Tr. 183). However, even as he was talking to Spath, Tamres signed a notice of default addressed to Hy Art prepared by Ms. Keenan which terminated any possibility of a resurrection of negotiations. (Tr. 188).

On October 28, 1988 Hy Art demanded the return of the $50,000 it had put up in escrow and its demand has not been honored.

## DISCUSSION

Hy Art is entitled to the return of its deposit because (1) no closing has ever taken place; and (2) Mercury has failed to prove that it was ready, willing and able to close on October 20, 1988 or any other time.

■ The relatively simple issue now before the Court dictates its own answer as soon as it is formulated: Is Hy Art entitled to the return of a $50,000 deposit given as evidence of its good faith in offering to buy Mercury's assets provided certain conditions were met?

The money was to be held in escrow by the secretary to the Creditors Committee— not by Mercury—in a segregated interest-bearing account for the account of Hy Art. It was accepted and received on the follows terms:

If this proposal is accepted by you and the conditions hereto have not been satisfied, or the Closing shall not have taken place, by September 14, 1988, this proposal and your acceptance thereof shall be deemed withdrawn without any further liability on the part of you or Hy Art, whereupon this proposal shall terminate and be of no further force or effect and the Deposit, with any interest accrued thereon, shall be returned to Hy Art.

(Letter Agreement, p. 3).

It is undisputed that no closing ever took place, either on September 14, 1988 or on any other date. Assuming, without deciding, that Hy Art waived the right to insist that a closing take place on September 14, 1988, Hy Art never waived the right that there be a closing or that its money be returned if there were no closing. *S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.*, 307 F.2d 750 (2d Cir.1962) (the party to a contract does not waive his rights under the contract by failing to insist upon performance at the due date and by encouraging the other party to perform thereafter); *General Supply & Const. Co. v. Goelet*, 241 N.Y. 28, 148 N.E. 778 (1925). Nowhere did Hy Art consent that its deposit be forfeited or be deemed liquidated damages, whatever the reasons for the failure to close. Hy Art's proposal, acquiesced in by both Mercury and the Creditors Committee, was that if there were no closing Hy Art's money should be returned to it.

The parties came close to closing on October 20, 1988, but all agreed that the day terminated without the necessary papers being signed. While what occurred thereafter is not crystal clear there is no question that on October 25th the debtor's attorney, Shaw, Licitra, signed a notice of default, putting an end to the possibility of there ever being a closing.

On these facts alone Hy Art is entitled to the return of its money pursuant to the terms on which it was put in escrow. As said earlier, Hy Art may have waived the right to insist that the closing be held on a specific date, but it did not waive its right to get its money back if there never was a closing.

■ In addition to the fact that a closing never took place, Mercury has failed to prove that it was able, willing and ready to close on October 20, 1988, on which issue it has the burden of proof. *Decor by Nikkei International Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 908 (S.D.N.Y.

1980, *aff'd. sub nom, Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Ufitec, S.A. v. Trade Bank & Trust Co.,* 21 A.D.2d 187, 249 N.Y.S.2d 557, 560 (1st Dep't.1964), *aff'd,* 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965). The evidence establishes exactly the contrary, that the conditions spelled out in Hy Art's proposal were not met on October 20, 1988 and it is doubtful whether they ever could have been met. Furthermore, Adams, a 50 percent stockholder in Mercury, materially changed the terms to which Hy Art agreed when he insisted upon the immediate release to him of the collateral held by IFTI whereas Hy Art's proposal spoke of 60 days following the closing within which to secure the release of such collateral.

That Hy Art, because of its desire to close the deal, continued to negotiate and did not declare the contract terminated when it discovered the shortage in the inventory or learned of the new conditions imposed by the landlords and IFTI, balking finally only when it was asked to pay IFTI's attorney not the $1,000, to which Hy Art had reluctantly agreed, but $2,100, did not turn Mercury's failure to meet the conditions laid down in Hy Art's proposal into the satisfaction of those conditions. Mercury never had the ability to accept Hy Art's offer and to make the sale called for and approved by the Court.

Mercury was not prepared to close on October 20, 1988. It did not have then, and was never going to have, the ability to meet the conditions laid down in Hy Art's offer.

Mercury's inventory on October 20, 1988 did not have a value of not less than $250,000. Ruth's explanation for the defective, dirty inventory found by Hy Art on its inspection on September 30, 1988 was that defective inventory had mistakenly been placed in front of good inventory creating the impression that the inventory was all defective; that no more than five to ten percent of the goods would have had to be refinished; that only a few thousand dollars would have been needed to put the defective merchandise in good condition; and that giving credit for some tubing and catalogs inadvertently included in the inventory Mercury would still have been left with over $257,000 worth of good inventory. Passing the fact that this testimony scarcely adds up to proof of a value of $250,000, the explanation is ludicrous in light of Ruth's testimony that the reason the inventory was not made available for inspection earlier than two days before the originally scheduled closing was that it was necessary to ready it for inspection. (Tr. 134).

Obtaining the consents of the landlords to the assignment of the leases in return for payments by Hy Art over and above the amount needed to cure any arrearages in the rent did not satisfy the condition precedent that Mercury obtain the landlords' consents to the assignments and required of Hy Art more than it had intended to pay. It had only agreed to pay whatever was "necessary to cure existing defaults in the payment of rent under your [Mercury's] leases." (Letter Agreement, p. 2).

Mercury was never in a position to deliver title to its inventory free and clear of all liens, claims, charges and encumbrances as called for by its acceptance of Hy Art's offer.

Exactly as Mr. Delman, the attorney for Hy Art, testified, the seller, that is Mercury, had the obligation to get IFTI to release its inventory lien. "The seller could not consummate the deal unless it did that and the seller was in a contractual relationship with IFTI and, therefore, was the only one in position to consummate that." (Tr. 84). But Shaw, Licitra, far from recognizing that as its obligation, even put pressure on Hy Art to pay the fees of IFTI's counsel on the theory that because Hy Art wanted to buy Mercury's inventory that counsel's presence was to Hy Art's benefit and Hy Art should consequently bear the expense. (Tr. 202).

Requiring Hy Art to pay IFTI, to give IFTI very substantial monetary guaranties in return for a release of IFTI's lien on Mercury's inventory, was not a delivery

free and clear of liens. Any lien can be paid off or satisfied.

The approval given by the Bankruptcy Court was to a very different sale than the one Hy Art was asked to enter into on October 20th. The Court never approved the payment of fees in any amount to the attorneys for the landlord or to the attorneys for IFTI; it never approved the delivery of a $24,000 note to Mercury's stockholder, Adams, or alternatively, delivery of a note in like amount to IFTI to secure the release of Adams' personal collateral.

Neither the Court nor Mercury's creditors were advised that the closing on Mercury's deteriorating assets was postponed from September 27th to October 20th nor of the constant escalation of the demands made on Hy Art by Adams and Mercury's landlords. The creditors should have been the recipient of whatever Hy Art was willing to pay for Mercury's assets, not the landlords nor IFTI.

The Court, during the course of the hearing, commented on what it deemed the inadequacy of the notice given creditors, saying:

> [W]hen there is a disposition of assets—and this was a sale of a going business so it's a disposition of all the assets—and in the absence of what we call a plan, notice has to be given to all creditors.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Now there were very significant changes, in my opinion, there were changes that affected the deal from, it seems to me the viewpoint of creditors to some extent. The deal was sweetened to take care of Mr. Adams. It was sweetened in terms of the secured creditor. These are matters which are of concern to the creditors and which they're entitled to have notice.

(Tr. 129–130)

That the closing did not take place on October 20, 1988 is the fault of the debtor. Hy Art tried in good faith to consummate the purchase.

The facts here are very similar to those presented in *In re Global Int'l Airways Corp.*, 70 B.R. 228 (Bankr.W.D.Mo.1986)

where the Court held that the debtor-in-possession was entitled to the return of $50,000 it had paid as an earnest money deposit on a contract which did not become final since the defendant sought to add additional material terms to the contract subsequent to the payment of the deposit. The Court there said:

> [T]he law clearly recognizes the principle that for a contracting party to insist on additional material preconditions to its performance is for it to breach the original contract by repudiation. (footnotes omitted).

*Id.* at 234.

At the very least Hy Art is entitled to the return of its money.

Hy Art's obligation was discharged by the failure of the events laid down as conditions precedent in its offer to occur. *Internatio–Rotterdam, Inc. v. River Brand Rice Mills, Inc.*, 259 F.2d 137 (2d Cir.1958), *cert. denied*, 358 U.S. 946, 79 S.Ct. 352, 3 L.Ed.2d 352 (1959) (the non-occurrence of a condition entitles other party to treat its contractual obligations as discharged); *In re Lafayette Radio Electronics Corp.*, 8 B.R. 528 (Bankr.E.D.N.Y.1981) (until a condition precedent has been satisfied there is no enforceable relationship between the parties); *In re Jensen, Inc.*, 1 B.R. 239 (Bankr.S.D.N.Y.1979) (a condition precedent is an act or event which must exist or occur before a duty of immediate performance arises).

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), (O).

Hy Art is entitled to the return of the deposit with accrued interest which it lodged with the Creditors Committee in escrow.

Settle Order.